UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|         Plaintiff, | ) |
| v. | ) Criminal No. 1:21-CR-00569 (TNM) |
| JESSE R. BENTON, | ) |
|         Defendant. | ) |

**DEFENDANT JESSE R. BENTON'S OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT EVIDENCE**

Defendant, Jesse R. Benton, by and through undersigned counsel, hereby submits his Opposition to the United States of America's Omnibus Motion *In Limine* to Admit Evidence and states as follows in support:

Defendant filed an opposition to the Government's February 14, 2022 Federal Rule of Evidence 404(b) Notice. ECF No. 33 ("the Notice"). Defendant filed the opposition in an abundance of caution as counsel was unaware of how the Government would seek to admit the evidence that was the subject of the Notice and did not want to waive any rights to object to the Notice or give any indication of consent.

The Government's current omnibus motion addresses all but one of the areas of evidence that it sought to include in the Notice.[1] The omnibus motion included more facts and arguments than the initial Notice, therefore, this supplemental opposition will address aspects of the omnibus motion that were not addressed in the Defendant's initial opposition. With respect to the proffered evidence in the omnibus motion, Mr. Benton does not object to the inclusion of the

---

[1] The area of evidence in the Notice which was not in the omnibus motion were the text messages between Mr. Benton and Courtland Gettel regarding a $300,000 donation which did not happen. This aspect of the Notice is presumed withdrawn as it is not in the omnibus motion.

evidence that predated the inception of the charged conspiracy by Mr. Wead as the evidence fortifies Mr. Benton's motion to dismiss that there was no criminal conduct in this case. Mr. Benton maintains and re-affirms his objection to the introduction of evidence regarding his prior conviction on both a Rule 404(b) and Rule 609 basis, and maintains and re-affirms his objection to the "evidence" from the foreign news outlet regarding the sting operation it engaged in with Mr. Benton if Mr. Benton chooses to testify.

**I.      Introduction**

In the Government's factual background of its motion, it continues to distort the facts of the case while at the same time showing that the facts do not constitute a crime. The Government makes a bold assertion in its introduction – that Mr. Benton "sought to conceal its [the conspiracy's] illegal object" and "Defendant continued to try to hide Foreign National 1's identity, by, among other things, initially only providing Wead's name to Political Committee B." Government's Omnibus Motion at 3. However, the Government's assertions are easily countered by their own allegations – the Government references Paragraph 42 of the Indictment for support that Mr. Benton tried to hide Foreign National 1's identity on September 21, 2016, but then the Indictment states that *the very next day*, September 22, 2016, Mr. Benton provided Foreign National 1's name. Indictment, ¶ 46. Therefore, the Government's bold, grand statement that Mr. Benton tried to hide Foreign National 1's identity falls flat. Furthermore, the Government's assertion that Mr. Benton did not purposefully provide Foreign National 1's name is slightly disingenuous because the Government is fully aware through the discovery provided in this case that the Defendant did provide Foreign National 1's name so that he could be cleared to attend the subject photo line event by the United States Secret Service. Therefore, the Government's summary of the evidence is not accurate.

However, one aspect of the summary that is accurate is the allegation that "Wead told Foreign National 1 that he could meet a celebrity."  Government's Omnibus Mot. at 2, Indictment ¶ 25.  This continued theme – that Foreign National 1's intent throughout this case was to meet a celebrity, further fortifies Mr. Benton's arguments made in the motion to dismiss the indictment, ECF No. 34, that there was no intent by Foreign National 1 to influence a federal election as the intent was to meet a celebrity, who in this case also happened to be running for President of the United States.  This clear intent demonstrates why the Indictment should be dismissed.

II.    **Response to Government's Specific Proffered Evidence**

   A.    **Mr. Wead's Pre-Conspiracy Conduct Has Nothing to Do with Mr. Benton And Shows the Object of the Conspiracy Was Not a Crime But is Not Objected To**

For the first time in this case, it is alleged that Mr. Wead had prior dealings with Foreign National 1 and 2 which purportedly provides context for the alleged acts in this case.  Specifically, the Government asserts that prior to Mr. Wead contacting Mr. Benton, he "arranged for Foreign National 1 to donate $100,000 to Company B (Mr. Wead's company) in exchange for an award from the organization," with a promise to "meet a celebrity."  Government's Omnibus Motion at 4.  The Government asserts that Mr. Wead gave a 10% commission to Foreign National 2 from these funds, $40,000 in gifts to his daughters, used some for personal and business expenses, and ultimately wired $20,000 back to Foreign National 1 because the meeting with a celebrity did not materialize and Foreign National 1 was concerned about what he was getting for his money.  *Id*.

This conduct has absolutely nothing to do with Mr. Benton.  There is no evidence of any knowledge by Mr. Benton about Mr. Wead's prior arrangement with Foreign National 1,

3

payment of $40,000 to Mr. Wead's daughters and a 10% commission to Foreign National 2.  Mr. Benton was not involved in any way with the initial proposed celebrity meeting, or any financial arrangements thereof.  The evidence shows Mr. Wead's use of Mr. Benton to get Foreign National 1 to see a "celebrity" and cover for Mr. Wead's initial failure to deliver on that promise.

Nevertheless, Mr. Benton does not object to the introduction of this evidence.  The Government acknowledges that because Mr. Wead was having difficulty finding a celebrity for Foreign National 1 to meet, he then contacted Mr. Benton.  *Id*.  ***This is the purpose and goal of the entire transaction between Mr. Wead and Mr. Benton***.  Specifically, the Government states that "[b]ecause Wead represented to Foreign National 1 that he would receive an award and meet a celebrity, but subsequently had difficulty delivering on his promises, Wead enlisted Defendant to facilitate a meeting between Foreign National 1 and Political Candidate 1 at a political fundraiser."  Government Omnibus Motion at 10.  The Government argues that not including this information would "deprive the jury of important information regarding the true nature of the criminal scheme," *id*., but what it actually shows is how there was no crime in this case at all.  Based on this additional context, it shows that the conduct in this case is not a conspiracy to commit any criminal election offenses but rather was a way for Mr. Wead to make good on his initial failed promise that Foreign National 1 could come to America to meet a celebrity, not to back-door Russian money into a political campaign through Mr. Benton.

This new context only strengthens Mr. Benton's motion to dismiss because it yet again shows Foreign National 1's entire intent in his coming to the United States – to meet a celebrity.  It is respectfully requested that this argument be incorporated by reference into the previously filed motion to dismiss.  Foreign National 1 paid $100,000 to Mr. Wead to meet a celebrity prior to Mr. Benton getting involved, and did not specify that that celebrity had to be connected to

4

American politics in any way or that he sought to influence any federal election. That transaction was unsuccessful. Mr. Wead then contacted Mr. Benton to see if for the second time he engaged Foreign National 1 and promised a celebrity meeting he could be successful. Mr. Benton was successful in fulfilling that specific mission, and that mission cost $25,000. However, unlike in the prior failed venture by Mr. Wead, it is not alleged that Mr. Wead profited from the $100,000 paid to Mr. Benton, except to smooth over relations with Foreign National 1 from the initial failed venture that cost Foreign National 1 $80,000 for nothing.

Therefore, this evidence again shows why the Government has failed to allege a contribution under FECA and the only "conspiracy" was to collaborate to get Foreign National 1 a picture with a celebrity. *See* ECF No. 34. It is not a crime to conspire to arrange to have someone meet a celebrity and paying a fee for arranging that meeting – celebrities charge money for VIP meetings and photo opportunities and experiences and that is what happened in this case with Mr. Benton as the facilitator.[2] Therefore, Mr. Benton does not object to the admission of this evidence as it strengthens his motion to dismiss and his defense.

        B.        **<u>Mr. Benton's Prior Conviction Is Not Admissible Under Rule 404(b)</u>**

Mr. Benton's prior conviction in the United States District Court for the Southern District of Iowa should not be admitted in this case pursuant to Rule 404(b). This case does not contain the "same hallmarks" as the case in Iowa as the Government asserts, as this case involves an alleged straw donor from a foreign country and access to a photo line to meet a celebrity, and the Iowa conviction dealt with endorsement switching and money paid for that purpose that took place in the context of a busy, contentious election season that Mr. Benton was involved in with

---

[2] The Government states that to the extent the Court does not admit the evidence as intrinsic to the conspiracy, then it should be admitted under Federal Rule of Evidence 404(b), but this is a *non sequitur* because it is not Mr. Benton's alleged bad acts that are proffered, it is Mr. Wead's alleged acts in connection with the failed venture. It is not alleged that Mr. Benton had any knowledge of Mr. Wead's prior dealings, and therefore, those dealings cannot be imputed to Mr. Benton for Rule 404(b) purposes as they pre-date the conspiracy.

5

multiple other parties. Government Omnibus Motion at 13. This case is different than the narcotics or firearm cases noted by the Government in its motion in which prior convictions are routinely admitted because in those cases the prior possession or distribution of narcotics or possession of a firearm is plainly illegal and there are typically similarities in the conduct such as wiretaps and distribution networks and transactions in specific geographic areas. In this case, there is a question as to whether the acts Mr. Benton committed in Iowa were actually crimes or bad acts at all. Indeed, one aspect of the case that is noted by the Government demonstrates why this evidence should not be admitted pursuant to Rule 404(b) – that in connection with the pardon, the White House specifically stated that according to the former Chairman of the Federal Election Commission, "the reporting law was unclear and not well established at the time." Government's Omnibus Motion at 7; ECF No. 32-1 at 9.

    This statement only heightens the concerns about the mini-trial that will have to take place if this evidence is admitted on a Rule 404(b) basis – the government will have to call a number of witnesses to present the evidence regarding Mr. Benton's prior conviction and the complex facts therein, and the more witnesses that are called and evidence propounded regarding the prior case, the more likely the jury will impute guilt to Mr. Benton for this case. *See United States v. Thorne*, 2020 WL 122985 at *10 (D.D.C. Jan 10, 2020) (CR 18-389) (stating that "[T]he cumulative impact of this drip-drip-drip is much more likely to wear away the jurors' resistance to using the evidence for an improper propensity purpose") (citing Wright & Graham, 22B FEDERAL PRACTICE & PROCEDURE: EVIDENCE § 5259 (2d ed. 2017)).

    Furthermore, Mr. Benton may have to call witnesses such as Mr. Goodman or the Department of Justice Pardon Attorney to inform the jury that the evidence that the Government is proffering as a prior bad act was, in fact, not a legally bad act at all, which led to the pardon.

6

This has the potential for serious confusion at trial and the Court should not admit the evidence on Rule 404(b) grounds.

Furthermore, to the extent that the Government seeks to introduce the prior case regarding the campaign reporting aspect regarding the purported similarities between the expense report in the Iowa case and the contribution report in this case that Mr. Benton himself did not personally issue or send to the FEC, it is pure propensity and character evidence to attempt to show that Mr. Benton is a campaign finance offender. This is exactly what Rule 404(b) seeks to prohibit. *See Thorne*, 2020 WL 122985 at *5 (stating that "[t]his rule (404b) codifies the common law tradition of "disallow[ing] resort by the prosecution to" propensity evidence — that is, "evidence of a defendant's evil character to establish a probability of his guilt.") (citations omitted).

The potential unfair prejudicial effect is significant in this case. As noted in the initial Opposition, the jury will impute guilt in this case based on his conviction in the prior case – as noted by the Court in *Thorne* "[s]uch "propensity evidence is relevant," but "the risk that a jury will convict for crimes other than those charged — or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment — creates a prejudicial effect that outweighs ordinary relevance." *Id*. at *5 (citations omitted).

Furthermore, and critically, the pardon may have a very mixed perception by the jury as some, and likely very few, may believe its validity but it is far more likely that the jury will have a very negative perception of the political nature of the pardon process and have strong feelings one way or the other regarding the former President who issued the pardon. As noted by Judge Sullivan in *United States v. Flynn*, 507 F.Supp.3d 116, 136 (D.D.C. 2020), "[t]he history of the Constitution, its structure, and the Supreme Court's interpretation of the pardon power make

7

clear that President Trump's decision to pardon Mr. Flynn is a political decision, not a legal one." When the entirety of the conviction, the pardon and its attendant emotions it will inevitably bring out, and explanation by the White House is considered, the overall prejudicial impact is significant and will not be able to be overcome by any limiting instruction, even a carefully worded instruction. As noted in the Opposition, the Government should focus on its current allegations and not seek to elicit other evidence that will likely have prejudicial impact on Mr. Benton.

        1.        **<u>Mr. Benton's Prior Conviction is Also Not Proper Impeachment Evidence</u>**

With respect to the Government's assertion that Mr. Benton's prior conviction should be permitted as impeachment if Mr. Benton testifies, although Mr. Benton understands and appreciates the case law cited by the Government regarding the general impact of a pardon on Rule 609 admissibility, this case provides a unique fact that the typical pardon case does not have – a statement by the White House in connection with the pardon adopting a statement from the former Chairman of the Federal Election Commission that "the reporting law was unclear and not well established at the time." Government's Omnibus Motion at 7, ECF No., 32-1 at 9-10. Therefore, based on this statement, it can be inferred that the pardon is based, at least in some part, on Mr. Benton's innocence as the statute he was convicted of was unclear and did not provide adequate notice to Mr. Benton on what conduct was prohibited in a complex election statutory regime. However, if the Court does not consider this statement to be related to Mr. Benton's innocence, it is respectfully submitted that if the Government is permitted to impeach Mr. Benton regarding the conviction if he testifies, not only will the fact of the pardon be proffered by the defense, but this statement by the former FEC Chairman as well. A jury will have significant confusion regarding this issue – they will be informed that Mr. Benton was

8

convicted, pardoned, and that a statement was made that the crime he was convicted of was not clear. This is a road that the Court should not travel in this case.

        C.      <u>**The Telegraph Article is Not a Proper Subject for Cross-Examination**</u>

With respect to the Telegraph article and the Government's request to cross-examine Mr. Benton regarding it if he testifies,[3] Mr. Benton's prior opposition sets forth the primary arguments for why this questionable evidence should not be admitted and those arguments are adopted and incorporated herein. *See* ECF No. 35. As additional argument, the Government categorizes the evidence as Mr. Benton and another individual being "caught," but it is clear that the undercover journalists created the sting operation on their own, and wrote a one-sided story about the encounter which was meant for internet clicks during a highly-publicized political season. It remains disappointing and unfortunate that the Government is bolstering this evidence and seeking its admission.

Furthermore, it is noted that in the initial opposition Mr. Benton referenced that the video for the alleged encounter between Mr. Benton and the reporter was no longer available on the Telegraph website, and the Government's exhibit to its Omnibus motion shows that fact. *See* Government's Omnibus Motion, No. 32-1, p. 14 (stating "[t]his video content is no longer available"). The fact that the Telegraph no longer has video to support its story is telling as to its credibility and reliability as evidence to be brought forward in this Court and validates the concerns raised by the *New York Times* that "[t]he video does not show how the reporters identified themselves and reflects only snippets of the reporters' conversations with Mr. Benton, ***making it difficult to verify exactly what Mr. Benton had offered or whether any laws were broken***." FEC Certification, MURs 7165 and 7196 (Great America PAC, et al.), Statement of

---

[3] It appears from the Government's Omnibus motion that it does not seek to admit the Telegraph evidence as Rule 404(b) evidence but only as impeachment evidence if Mr. Benton elects to testify in this case.

Reasons of Commissioner Sean J. Cooksey, October 5, 2021, at 10 (emphasis added).  This concern should be sufficient for the Government to question its reliance on this evidence.

The article that is included in the Government's Omnibus Motion raises questions as to whether Mr. Benton committed any bad acts for which impeachment is appropriate.  Aside from the obvious that the article has been edited in a salacious, one-sided way so not all of Mr. Benton's attributed quotes are in the article and thus there were likely omissions of helpful statements he made that would further contextualize or demonstrate the full contact between him and the undercover reporters – the attorney for the Political Action Committee in question stated that Mr. Benton did not solicit any contributions to the PAC, and simply engaged in "puffery and self-promotion." Government Omnibus Motion, ECF No. 32-1, at 20.  Additionally, Mr. Benton stated that he proposed a "public affairs contract" with his firm "**having determined money could not go into a 501(c)(4)**." *Id*. (emphasis added).  Finally, Mr. Benton purportedly provided a quote to the undercover journalists that is the embodiment of why this evidence should not be admitted in any fashion – "everything we're doing is legal by the book but there's perceptions and grey areas." *Id*. at 27.  Admission of this evidence would force the Court to engage in a mini-trial to address the "perceptions and grey areas" and that would cause a significant disruption to the trial in this case.

Finally, the Government's request to cross-examine Mr. Warrington, Mr. Benton's former attorney, regarding whether he sought advice on the Telegraph-related facts, is improper as it expands the advice of counsel defense to an area that has not been waived by Mr. Benton. Additionally, the Government is well aware that Mr. Warrington represented Mr. Benton in the FEC proceedings concerning the Telegraph case that were cited in Mr. Benton's initial opposition, in which there was a no probable cause finding.  *See* FEC Certification, MURs 7165

10

and 7196 (Great America PAC, et al.) (Aug. 31, 2021); *see also* FEC Certification, MURs 7165 and 7196 (Great America PAC, et al.), Statement of Reasons of Commissioner Sean J. Cooksey, October 5, 2021.  Mr. Benton has not waived his attorney-client privilege on this issue, and therefore the Government is not able to seek information concerning that aspect of the case.  This request again shows why this entire area of inquiry is improper in this case.

### III.     Conclusion

It is respectfully requested that the proposed Government's 404(b) evidence that Mr. Benton objects to in his prior Opposition and herein not be permitted.


Dated:  August 19, 2022                              Respectfully submitted,


                                                  By: */s/ Brian W. Stolarz*
                                                  Brian W. Stolarz (D.C. Bar No. 466160)
                                                  Norton Rose Fulbright US LLP
                                                  799 9th Street, NW, Suite 1000
                                                  Washington, DC 20001-4501
                                                  Telephone: (202) 662-0309
                                                  Facsimile: (202) 662-4643
                                                  Email: brian.stolarz@nortonrosefulbright.com
                                                  *Counsel for Defendant Jesse R. Benton*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that this document filed through the CM/ECF system on August 19, 2022, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Brian W. Stolarz
Brian W. Stolarz