IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **Criminal No. 1:21-cr-00569-TNM** |
| **v.** | ) | |
| | ) | |
| **JESSE R. BENTON,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**UNITED STATES' TRIAL BRIEF**

The United States' evidence at trial will establish that Jesse Benton ("Defendant"), working together with Roy Douglas Wead, solicited and caused a contribution from Roman Vasilenko, a Russian foreign national, to political committees in the United States. Defendant ultimately contributed $25,000 of Vasilenko's funds under his own name, obscuring the true source of the funds and causing false FEC reporting by three separate political committees. This Trial Brief describes how the scheme worked, how the government will prove it, and certain legal and factual issues that may arise during trial.

## I. RELEVANT BACKGROUND

### A. Procedural History

On September 9, 2021, a federal grand jury sitting in the District of Columbia returned an indictment charging Defendant and Roy Douglas "Doug" Wead ("Wead")[1] with one count each of 18 U.S.C. § 371 (conspiracy); 52 U.S.C. § 30121 (electoral contributions by foreign nationals); and 52 U.S.C. § 30122 (electoral contributions in the name of another); and three counts each of

1 Following the Indictment, Wead passed away. On December 23, 2021, the Government filed a Motion to Abate Prosecution as to Wead only. The Court granted that Motion the same day. As such, this case is proceeding as to Defendant only.

18 U.S.C. § 1519 (causing false records). Trial in this matter is presently scheduled to begin November 9, 2022.

**B. Factual Background**

As alleged in the indictment, these charges arise out of a conspiracy between Defendant and Roy Douglas Wead to solicit and cause an illegal campaign contribution by a Russian foreign national, Roman Vasilenko ("Vasilenko"), and to conceal the true source of the funds by using Defendant as a conduit contributor, thereby causing false FEC reporting of the contribution.

1. *Background to the Conspiracy: Roman Vasilenko Donates $100,000 to Charity Awards International, Expects to Meet a Celebrity*

On April 1, 2016, Vasilenko, a Russian businessman who resided in Russia, wired $100,000 to Charity Awards International, a largely defunct non-profit run by Wead. The express understanding between the parties was that Vasilenko would travel to the United States, attend an awards dinner hosted by Charity Awards, and at the event meet a celebrity. Wead, however, struggled to find a celebrity for Vasilenko to meet, and had still not found someone by early September 2016. On September 11, 2016, approximately eight weeks prior to the 2016 election, Wead first suggested, via email, that Vasilenko could meet then candidate Donald Trump. That same day he reached out to Defendant telephonically. Wead and Defendant connected the next day, September 12, 2016, and spoke twice on the telephone. On September 13, 2016, Olga Kovalova, who worked as a Russian translator for Wead and served as an intermediary between Wead and Vasilenko emailed Wead asking, "Doug, is there any news about Trump?" Wead replied, "My source says yes it will happen but no details yet."

   2. *Wead and Defendant Solicit a Contribution from Vasilenko; Come Up With a Cover Story For the Funds*

On September 13, 2016, the day after Wead and Defendant connected via phone, Defendant reached out to staff members at the Republican National Committee ("RNC"), to find a political fundraising event that Vasilenko could attend. From the inception of this contact, Defendant hid Vasilenko's true identity from the RNC. In his initial email Defendant wrote, "I have a friend who spends most of his time in the Caribbean (must be nice right?), who has caught the Trump bug in a big way. [H]e wants to fly in for an event, hopefully near NY or DC, where he can attend a funder and get a photo. The[] photo is important to him. Is there anyway you might share a list of events where a photo might be possible? Ideally, he'd like to come between 9/21 and 9/27 if at all possible." Staff at the RNC responded by sending Defendant a flier with upcoming events hosted by Trump Victory.[2] Defendant followed up a few minutes later, asking staff at the RNC, "What would be the minimum giving level to be able to participate in a photoline at ether [sic] Greenwich (9/21), Philly (9/22) or NYC (9/29)? (not that that is all he'll give, but he'll ask me)" and "How do I RSVP when he has selected his event?" Defendant exchanged several additional emails with individuals at the RNC, asking additional questions regarding the fundraisers. That evening, Wead and Defendant spoke again via telephone. The very next day, September 14, 2016, Kovalova emailed Wead, "I've talked to Rom[a]n. He is happy and ready to wire his donation." In that same email, Kovalova stated, "He asks for info where to send his donation. It would be great to get it today. [H]e is leaving for his election trip." A couple of hours

2 Trump Victory was a a joint fundraising committee comprised of Donald J. Trump for President (the Donald Trump presidential campaign organization, referred to herein as the "Trump Campaign Committee"), the Republican National Committee ("RNC"), and 16 state Republican committees.

later, Wead replied, "thank you so much. [W]e want to do this correctly." That same day Defendant emailed an individual at the RNC, "We'd like to do the Philly event on 9/22 if possible" and asked to be connected to the organizer of the event.

In response to the request by Defendant, individuals at the RNC sent Defendant the official invitations to the Philadelphia fundraiser. One invitation was for a roundtable with Donald Trump, listing Trump as the "Republican Nominee for President of the United States," scheduled for September 22, 2016 at the Ritz Carlton, Philadelphia. The invitation listed three levels of giving, $100,000 to be a "Roundtable Host Committee"; $50,000 to be a Roundtable Sponsor; and $25,000 to be a Roundtable Attendee. The second page of the invitation was a contributor form. On the last page of the invitation was a paragraph stating the following, "Contributions to Trump Victory ("TV") are not tax deductible and will be used in connection with federal elections. Federal law requires us to use best efforts to collect and report contributors' names, mailing addresses, occupations, and employers."

On September 15, 2016, Defendant emailed Wead banking information for Titan Strategies, Defendant's political consulting company, with the subject "Wire info for consulting services." In the email, Defendant wrote, "I'll get an invoice whenever appropriate." Wead then forwarded the information to Kovalova, writing, "This is the banking info for sending the wire. My understanding is that it is for consulting services. Your team will be able to meet with these folks when you get here…Do you need an invoice?" Kovalova replied, asking for an invoice, indicating that it would make it easier to wire the money. Wead then forwarded the email to Defendant asking him for an invoice.

There appears to have been some confusion, however, regarding who was actually being invoiced. On September 15, 2016, Defendant emailed Wead, "But who should be invoiced?"

Wead forwarded Defendant's response to Kovalova and asked her for the "[n]ame, address, etc." of who should be invoiced. On September 16, 2016, Kovalova followed up on Wead's previous email regarding the invoice for Vasilenko's donation, stating: "I didn't understand your question, Doug. I resent Roman wire info you had sent me." Wead replied, "Perhaps I am misunderstanding you. I thought you said that Roman, himself, would not be wiring any money. But whomever wires the money needs to have an invoice. So to whom do they send the invoice? What is the name of the person or company or bank that needs an invoice?"

On September 16, 2016, Wead and Defendant spoke on the phone. Shortly thereafter, Wead sent an email to Defendant and Kovalova explaining that "the plan" was to have The Charity Awards "mission picked up and spread across the [Commonwealth of Independent States]…. Roman Vasilenko has the vision to make this work…He is willing to hire consultants here who can help him. And he is willing to donate to charities and NGO's [sic] in the USA who would participate with such a program over there." Wead then instructed Defendant to send Vasilenko an invoice for purported "consulting work" that Defendant would do for Vasilenko. Defendant ultimately did not email an invoice before Vasilenko wired the first part of the funds. Email records reflect that on September 19, 2016, Kovalova emailed Defendant and Wead, "Gentlemen, Roman wired $49000 without an invoice now. $51000 will go tomorrow. The bank doesn't take the whole sum." Wead replied to Defendant and Kovalova, "Jesse, it wouldn't hurt to send the invoice anyway so they have it on his end." Later that day, Defendant sent an invoice to Kovalova, dated September 16, 2019, which was called "Invoice for Services" for "Titan Strategies LLC", and purported to be for "Consulting Services Charity Awards Dinner." The amount on the invoice was $100,000 and it included wiring instructions. The invoice was made out to Vasilenko.

Bank records reflect that on September 19, 2016, Vasilenko wired Titan Strategies $49,000 and on September 20, 2016, Vasilenko wired Titan Strategies $51,000, both from a bank based in Vienna, Austria. Bank records also reflect that Defendant was the only authorized signer on the business account for Titan Strategies. Email records reflect that on September 19, 2016, Wead emailed Defendant a copy of Vasilenko's Russian passport, so Vasilenko could get cleared by the Secret Service prior to the event.

3. *Vasilenko Travels to the United States; Attends the Fundraiser and Meets Donald Trump*

Vasilenko arrived in the United States on September 20, 2016. On the morning of September 21, 2016, after the entire $100,000 had been wired to Titan Strategies, Defendant emailed an individual at the RNC, "We'd like to buy 2 tickets to tomorrow nights Philly Roundtable, 50k total. Doug Wead and a guest will attend for us. Doug is a former White House advisor to HW Bush and is doing debate commentary for Shepherd Smith at FOX." Email records reflect that later that same morning, Defendant made hotel reservations for Wead, Vasilenko and Kovalova at the Ritz Carlton Hotel in Philadelphia. Defendant additionally booked a car service to take Wead and two other individuals to the Ritz Carlton Hotel in Philadelphia on the date of the event and to return from the Ritz Carlton the next day.

On September 21, 2016, Defendant exchanged several emails with individuals at the RNC and Trump Victory relating to the event, but repeatedly failed to provide Vasilenko's information. For example, Defendant emailed an individual at the RNC, "I totally overlooked your email asking for names" and then proceeded to only give Wead's name for the event. That same day, a consultant for Trump Victory emailed Defendant the "vitals link" for the guests to fill out with their personal information. Later that same day, the consultant emailed Defendant asking, again, for the name of Wead's guest. The morning of September 22, 2016, the same day as the event,

Defendant finally responded to the consultant's email, "Mr. Roman Vasilenko." But Defendant had still not filled out the requested "vitals" information. Thus, on September 22, 2016, the consultant responded to Defendant, "It appears that we do not yet have Mr. Vasilenko's vitals. Could you please kindly ask that he submit asap?" Defendant agreed to do so, but it does not appear that he or Vasilenko ever filled out the requested information.

Vasilenko, along with Kovalova and Wead, attended the Roundtable campaign event on September 22, 2016 in Philadelphia, and met and took a photograph with Donald Trump. After the event, the consultant for Trump Victory emailed Defendant, "Jesse, we very much enjoyed meeting Doug, Roman, and Olga [Kovalova] this evening and we hope that they enjoyed the event. We ended up being able to get Olga into the room for the roundtable with Roman. Please let me know if they have any questions in follow up." Defendant replied, "Thank you again so much!! You must have had a crazy time with Mr. Trump (almost) cancelling and then showing up for photos!! Thanks for getting Olga in. And, the check is in the mail – literally. I dropped it in the box yesterday :)." Defendant followed up: "Doug is great BTW – he is doing debate commentary for Shepard Smith so he was very pleased to get to see 'The Man' in person."

On September 24, 2016, Wead hosted a gathering of approximately 14 people for a late lunch at the Maggiano's Little Italy in Tyson's Corner. At that event, Wead gave Vasilenko an award.

4. *Defendant Ultimately Contributes $25,000 of Vasilenko's Funds to Trump Victory, the RNC and the Trump Campaign*

Defendant did not immediately send the promised contribution. On September 30, 2016, the Trump Victory consultant emailed Defendant, asking for a tracking number as the "RNC had not yet received anything." A few days later, on October 3, 2016, Defendant replied, "Sorry, I somehow missed this email. I really apologize. How about if I put it on a credit card and stop

payment on the check? If that works, email me a link! Or, I can run and wire, but it will be tomorrow am." On October 10, 2016, Defendant emailed the consultant, "Hey – just making sure everything was received? Also, I know you have much bigger fish to fry, but any word when guests might receive their photos?" The consultant for Trump Victory followed up several times with Defendant, and finally on October 24, 2016, Defendant wrote back, claiming that the previous emails had gone to spam, and stating that he "bought the tickets and gifted them to Doug and Roman, so the money comes from me. And, I think I brain farted and forgot to send the authorization. I will resend as soon as I am at my desk." On October 26, 2016, over a month after the event, Defendant sent the second page of the invitation to the Philadelphia, Pennsylvania fundraising event with the credit card authorization filled out. On it, Defendant checked that he could not attend the event, but wanted to contribute $25,000. In the section labeled "CONTRIBUTOR INFORMATION," Defendant provided his personal information, including his name, home address, cell phone, and e-mail address. In the section labeled "PAYMENT INFORMATION," Defendant provided his personal credit card information. Following receipt of the contribution form, the consultant for Trump Victory emailed Defendant and asked, "Is this one to be credited towards Roman [Vasilenko] or Doug [Wead]?" Defendant responded, "Roman, please."

During this same time period, Vasilenko and Wead became very concerned about the photographs from the event. On October 2, 2016, Wead emailed Defendant, "I have two people who can do $100k. But I would ruin my relationship with them if it didn't happen or the photos were as late as it appears they will be. (Still no photos from Philly.)…10k is understandable but 100k should justify someone getting them their photo by email." On October 3, 2016, Kovalova wrote Wead asking about the photographs with Trump and Vasilenko noting, "Roman is getting a

bit impatient." On October 10, 2016, Wead emailed Kovalova, "I just got this text message from Jesse Benton[.] According to the RNC, pics should be mailed out within 2 weeks. Sorry for the delay." Kovalova followed up on October 26, 2016, asking again about the photograph, "Doug, I am afraid Roman will shred me into little pieces because of this picture with Trump. More than a month has passed and no picture. Is it possible it will never come? It's scary." That same date Wead emailed Defendant, "Why are they holding back the pictures? Roman already has his, which I took on the spot. So there is no reason to hold back from him…It is frustrating because I think I could have gotten a couple more $100,000 donations but how can I do it when I know they won't get their photos?" Defendant replied, "I honestly don't know. And I am really sorry. I have been promised them multiple times now. Incompetence at the RNC maybe? I don't know."

Credit card records for Defendant reflect a $25,000 charge to Trump Victory on October 27, 2016. FEC filings show that Trump Victory relied upon the information provided by Defendant and reported to the FEC that the money came from "Jesse Bentor," an apparent misspelling of Benton's name. FEC filings further reflect that $2,700 of Vasilenko's money went to the Trump Campaign Committee, and the rest went to the RNC. Although the FEC filings for Trump Victory and the Trump Campaign Committee show "Jesse Bentor" as the donor, the RNC filing with the FEC indicates that "Jesse Benton" was the donor. None of the FEC filings designate Vasilenko as the actual donor.

On November 3, 2016, Wead emailed Kovalova electronic versions of the official photographs from the event.

FEC records reflect that on December 8, 2016, the RNC submitted an FEC Form 3X "Report of Receipts and Disbursements for Other than an Authorized Committee" to the FEC in Washington, D.C. falsely reporting that "Jesse Benton" contributed $22,300. FEC records reflect

that on March 15, 2017, Trump Victory submitted an FEC Form 3X "Report of Receipts and Disbursements for Other than an Authorized Committee" to the FEC in Washington, D.C., falsely reporting that "Jesse Bentor" contributed $25,000. FEC records reflect that on July 20, 2017, the Trump Campaign Committee submitted an FEC Form 3P "Reports of Receipts and Disbursements by an Authorized Committee of a Candidate for the Office of President or Vice President" to the FEC in Washington, D.C., falsely reporting that "Jesse Bentor" contributed $2,700.

## II. The Government's Evidence

The Government intends to introduce the following evidence at trial.

1. *Emails and records seized via search warrant*

The government intends to introduce emails and other records seized via search warrant. During the course of the investigation, the government executed search warrants on various email accounts and seized emails from Defendant, Wead, and other individuals. These emails reflect communications between Wead and Defendant regarding the scheme, between Defendant and individuals at Trump Victory and the RNC regarding the scheme, and emails between Wead and Olga Kovalova regarding the scheme. Defendant has indicated that he does not intend to challenge the authenticity of these emails.[3]

2. *Certified business records*

The government intends to introduce certified bank records from SunTrust Bank, Republic Bank and Trust, and credit card records from American Express. The government also intends to introduce certified business records obtained from the Ritz Carlton, Philadelphia, J&J Transport, Maggiano's Little Italy, AT&T, Trump Victory, and the RNC. The government also anticipates

[3] Defendant has informed the government through counsel that he may raise other evidentiary objections to the emails.

introducing certified foreign business records from Austria, relating to Vasilenko's bank account. Defendant received all of these records in discovery, and the government gave timely notice of its intent to introduce these records. The government intends to introduce the domestic business records under Federal Rule of Evidence 803(6) and 902(11), and the foreign business records under 18 U.S.C. § 3505. Defendant has indicated that he does not intend to challenge the authenticity of these records.

3. *Certified public records, including FEC records*

The government intends to introduce certified public records including records from the Kentucky Secretary of State, the State Department, and the FEC. As to the FEC records, the government intends to introduce the FEC reports from Trump Victory, the RNC, and the Trump Campaign reflecting false contribution information that was submitted by Defendant. Certified copies of these documents have been provided to the defense in discovery. The government intends to introduce these documents as self-authenticating public records under Federal Rules of Evidence 902(1) and 902(4). Defendant has indicated that he does not intend to challenge the authenticity of these records. The government also intends to present the testimony of Michael Hartsock of the FEC. Mr. Hartsock will testify from personal knowledge that the FEC receives reports from political committees, that include information regarding contributions, and that those reports are then provided to the public online. The FEC performs these tasks to fulfill a function of providing accurate information about the finances of those committees, including contributions. This is a function in which Mr. Hartsock directly participates.

4. *Witness Testimony*

The government anticipates presenting witness testimony from law enforcement, employees from the RNC and associated political committees, and Michael Hartsock, as noted above.

5. *404(b) Evidence*

At the motion in limine hearing, the Court ruled that the government could introduce evidence relating to Defendant's previous campaign finance conviction under Federal Rule of Evidence 404(b). The government is presently in discussions with counsel for Defendant regarding a potential stipulation covering this evidence. Should the parties not reach a stipulation, the government anticipates introducing certified public records relating to Defendant's previous conviction, including the Indictment and the Judgment and Conviction.

**III. Legal Issues**

A. *The Court Should Not Allow Defendant to Argue a Legally Incorrect Definition of "Contribution."*

In the proposed jury instructions, Defendant asked the Court to give a "defense theory" instruction which misstates the legal standard for a contribution. As noted in the jointly filed proposed jury instructions, the United States objects to this proposed instruction. ECF No. 46 at 20. In that instruction, Defendant proposes that the definition of "contribution" under FECA depends upon the subjective intent of the donor and asks this Court to instruct the jury that "[i]f you find that the alleged contribution in this case was not made for the purpose of influencing any election for federal office, but rather for the securing of the photograph, then you must find the Defendant not guilty." *Id*. But that is not the law. Courts interpreting the relevant provision of FECA have rejected arguments that it requires an inquiry into the subjective state of mind of the individual giving the contribution. *See Fed. Election Comm'n v. Ted Haley Cong. Comm*., 852 F.2d 1111, 1116 (9th Cir. 1988). In *Haley*, the Ninth Circuit upheld the conviction of donors for violating the contribution provisions of FECA. *Id.* It specifically found the donors had given a contribution "for the purpose of influencing an election for federal office," where those donors made loan guarantees <u>after</u> the election to a candidate, who did not intend to run for office again,

to allow that candidate to secure a loan and pay off campaign debt. *Id.* at 1112, 1116. Although the donors had specifically signed affidavits swearing that none of them expected or intended that their loan guarantees would influence any election for federal office, the Court rejected a "purpose based objective guideline" test. *Id.* at 1116. In so doing the Court noted that an inquiry into the subjective state of mind of the donor in determining whether the contribution had the "purpose of influencing an election for federal office" would make it next to impossible to police the statute. *Id.*; *see also United States v. Sun-Diamond Growers of California*, 941 F. Supp. 1277, 1279 (D.D.C. 1996) (finding company properly charged with illegal contributions where company made contribution after the election to help retire debt of failed candidate); *United States v. Crop Growers Corp.*, 954 F. Supp. 335, 357 (D.D.C. 1997) (rejecting argument that a post-election contribution to a losing candidate, when there is no allegation that the candidate plans to run again, cannot influence an election for purposes of FECA's provisions regarding contributions).[4]

Furthermore, an FEC advisory opinion reflects that the FEC does an objective assessment of whether the contribution meets the statutory definition. Thus, in FEC Advisory Opinion 2000-08, 2000 WL 796342, at *1 (2000), the FEC was specifically asked to opine on an individual who wanted to give a "gift" to a Federal candidate for office, but who specifically stated that the gift was not intended to influence a federal election, but rather was to express the donor's "deep appreciation" for serving his country. In analyzing whether the "gift" was intended to influence a federal election the FEC rejected the donor's purported subjective intent, and rather looked to the

---

4 The United States recognizes that each of these cases involved contributions after the election, and that the FEC had a specific regulation that contributions made to retire debt were subject to FECA's limitations, as well as advisory opinions supporting that same finding. *See, e.g., Haley*, 852 F.2d at 1115. Nonetheless, were the Court to adopt Defendant's proposed definition of contribution, it would undercut this line of cases, because it would require an inquiry into the subjective state of mind of Defendant, rather than the objective inquiry that appears to be utilized by this Court and others as to whether the funds were linked to a federal election.

circumstances surrounding the gift, including the fact that "the proposed gift would not be made but for the recipient's status as a Federal candidate." *Id.* From that the FEC concluded "it is, therefore, linked to the Federal election" and would constitute a contribution. *Id.*

The government respectfully submits that an objective standard in examining whether the definition of "contribution" has been satisfied makes sense. If the Court were to adopt Defendant's version of the definition of "contribution," an individual could vastly exceed FECA's contribution limits, but could avoid civil and criminal liability simply by claiming that their true subjective intent was simply to give the candidate a gift, attend an event, or buy a picture or other political merchandise. Such a standard would eviscerate the campaign contribution limits and rules established by FECA, rendering them ineffective, and, as recognized in *Haley*, would be impossible to police. *Haley*, 852 F.2d at 1116.

Defendant can certainly argue, if he chooses, that the purpose of the contribution was to obtain a photograph, and therefore Defendant did not act with the requisite willfulness. But the Court should decline to give Defendant's proposed defense theory instruction and should not allow Defendant to argue that jurors must examine the subjective intent of the donor. *See United States v. Allen*, 43 F.4th 901, 910 (8th Cir. 2022) ("A defendant is entitled to a theory-of-defense jury instruction if the instruction is supported by the evidence and *correctly states the law*.") (internal quotations omitted) (emphasis added); *United States v. Mallory*, 40 F.4th 166, 180 (4th Cir. 2022) (same); *United States v. Begay*, 33 F.4th 1081, 1088 (9th Cir. 2022) (same); *United States v. Shulick*, 18 F.4th 91, 113 (3d Cir. 2021) ("A defendant is entitled to an instruction on a theory of defense if (1) *he proposes a correct statement of the law*; (2) his theory is supported by the evidence; (3) the theory of defense is not part of the charge; and (4) the failure to include an

instruction of the defendant's theory would deny him a fair trial.") (internal quotations omitted) (emphasis added).

B. *The Court Should Decline to Give a "Good Faith" Jury Instruction*

Defendant has also proposed that the Court give a "Good Faith" Jury instruction. ECF No. 46 at 17. The D.C. Circuit has found such an instruction redundant where the substance of such an instruction is adequately conveyed in the state of mind instructions relating to the charged offenses. *See United States v. Akhigbe*, 642 F.3d 1078, 1083 (D.C. Cir. 2011); *United States v. Howard*, 245 F. Supp. 2d 24, 38 (D.D.C. 2003) (affirming district court's decision not to give good faith jury instruction where other instruction "accurately recited the level of intent the government had to prove"); *see also* Trial Tr. at 26–28, March 7, 2022, *United States v. Diab & El-Saadi*, 1:19-cr-0374 (RDM) (declining to give identical good faith instruction in conduit contribution case relying on D.C. Circuit law where the instruction is "redundant with the elements"). Here the proposed substantive instructions include definitions of "knowingly" and "willfully" that adequately cover the substance of the good faith instruction. *See* ECF No. 46 at 10, 13. The Court should therefore decline to give Defendant's proposed instruction.

C. *Doug Wead's Interview with the FBI is Inadmissible Hearsay*

In the course of meeting and conferring about various trial issues and potential stipulations, counsel for Defendant indicated that he intended to introduce portions of Doug Wead's May 27, 2021 interview with the FBI through cross examination of the case agent. Wead was interviewed in conjunction with a search warrant that was executed at his residence. It is the United States' understanding that Defendant wishes to introduce various statements including explanations and denials made by Wead during the course of that interview for the truth of the matter asserted.

These statements should not be allowed into evidence because they are inadmissible hearsay, not subject to any exception. *See* Fed. R. Evid. 801(c).[5]

The fact that Wead is unavailable does not change this analysis. Fed. R. Evid. 804(b)(3) allows in statements where: (1) the declarant is unavailable; (2) the statement is against interest, defined as "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability"; and (3) the statement "is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability." The statements that Defendant appears to wish to introduce are not against Wead's interest at all; rather, they are his self-serving attempts to avoid criminal liability. *See generally United States v. Slatten*, 865 F.3d 767, 805-06 (D.C. Cir. 2017) (observing no abuse of discretion in holding that 804(b)(3) inapplicable to exculpatory self-defense claims "not 'clearly'" against a declarant's interest). The remainder of the hearsay exceptions where a declarant is unavailable do not apply. *See* Fed. R. Evid. 804(b).

The residual hearsay exception also does not permit introduction of Wead's interview statements. Under Rule 807, a statement is admissible where "the statement is supported by

---

[5] Defendant cannot get around the fact that these statements are hearsay by claiming that they are co-conspirator statements. *See* Fed. R. Evid. 801(d)(2)(E). For a statement to come into evidence as a non-hearsay co-conspirator statement it must be "offered against an opposing party" and must have been "made by the party's co-conspirator during and in furtherance of the conspiracy." *Id.* In other words, although the United States can offer Wead's statements made in furtherance of the conspiracy against Defendant (because Defendant is an opposing party and Wead was his co-conspirator), Defendant cannot offer those same statements against the United States. *See id.* Moreover, there is no evidence that the conspiracy lasted until 2021, or that the self-serving statements that Wead made to law enforcement were "in furtherance" of the conspiracy.

sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement" and "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable effort." Fed. R. Evid. 807(a). For a statement to be admissible under Rule 807, the proponent must give an adverse party "reasonable notice of the intent to offer the statement--including its substance and the declarant's name." Fed. R. Evid. 807(b).

"The residual hearsay exception is extremely narrow and require[s] testimony to be very important and very reliable." *Slatten*, 865 F.3d at 807 (internal quotations omitted). "Thus, only in the most 'exceptional circumstances' does Rule 807 make admissible a statement that does not fall within one of Rule 803's or Rule 804's enumerated hearsay exceptions." *Id.* Wead's interview with the FBI does not present such an exceptional circumstance. Indeed, "in order to find [a] statement trustworthy, a court must find that the declarant of the prior statement 'was particularly likely to be telling the truth when the statement was made.'" *Id.* (internal quotations omitted). But a confrontational interview with the FBI is precisely the type of situation where a defendant, probed for the first time about his criminal conduct, is likely to try to minimize, deflect, and deny, which is precisely what Wead did. This situation is therefore a far cry from the "exceptional circumstances" qualifying for 807 in *Slatten* where the declarant had been immunized and gave the same story multiple times over multiple interviews and corroborating evidence supported his statements. *See id.* The Court should not allow Defendant to introduce Wead's self-serving hearsay.

D. *Charging Decisions*

The D.C. District Court has recognized that the "Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws." *United States v. Stone*,

394 F. Supp. 3d 1, 10 (D.D.C. 2019) (internal quotations omitted) (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)). This authority "lies at the core of the Executive's duty to see to the faithful execution of the laws." *Id*. (internal quotations omitted) (quoting *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986)); *accord* U.S. Const. Art. II, § 3; *see* 28 U.S.C. §§ 516, 547.

As a general matter, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 368 (1978); *accord United States v. Cespedes*, 151 F.3d 1329, 1332 (11th Cir. 1998); *see also United States v. Batchelder*, 442 U.S. 114, 124–25 (1979) ("Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints."). The claim that others "could have been charged but were not" is not a factual defense that bears upon whether the defendant is guilty of the crimes charged by the Grand Jury. *See Armstrong*, 517 U.S. at 463-64. *United States v. Smith*, 231 F.3d 800, 807 (11th Cir. 2000). Evidence that some other individual is currently uncharged has no probative value to the issues at trial and serves only to confuse or mislead the jury. *See* Fed R. Evid. 402, 403.

Judged under these legal principles, Defendant should be precluded from introducing evidence or making arguments regarding charging decisions made by the United States, including any argument that the charges in this case were politically motivated. *See United States v. Abboud*, 438 F.3d 554, 579 (6th Cir. 2006) ("[T]he defense of selective prosecution is a matter that is independent of a defendant's guilt or innocence, so it is not a matter for the jury.") To the extent that Defendant seeks to present evidence or arguments: (1) that the charges in this case were politically motivated; (2) that other individuals have not been charged for similar or related

conduct; or (3) that it is unfair that Defendant was charged, while other individuals involved in criminal conduct remain uncharged, such evidence is irrelevant, inadmissible, and only serves to divert the jury's attention to matters unrelated to Defendant's guilt or innocence.

Respectfully submitted,

Corey R. Amundson
Chief
Public Integrity Section

By: *\/s\/ Michelle L. Wasserman*
Rebecca G. Ross
Michelle K. Parikh
Trial Attorneys
Public Integrity Section
Criminal Division
U.S. Department of Justice

Michelle L. Wasserman
Special Assistant United States Attorney
United States Attorney's Office for the
District of Columbia

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this date, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the Defendant.

Dated: October 26, 2022

*/s/ Michelle L. Wasserman*

Michelle L. Wasserman

Special Assistant United States Attorney
United States Attorney's Office for the
District of Columbia