UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | |
| ) | |
| JESSE R. BENTON, ) | CRIMINAL NO. 1:21-CR-00569 (TNM) |
| ) | |
| Defendant. ) | |
| _____ ) | |

**DEFENDANT'S RESPONSE TO GOVERNMENT'S TRIAL BRIEF**

Defendant, Jesse R. Benton, through undersigned counsel, hereby submits this response to the government's trial brief filed in this case, ECF No. 47, regarding a specific issue addressed in the brief, and states the following in support.

**I.   Introduction**

Initially, it is noted that the government is not required to file a trial brief under the Federal Rules of Criminal Procedure, or any Scheduling Order of this Court. The Court requested a statement of the case, which was filed on October 14, 2022. ECF No. 44. The trial brief is not necessary to resolve issues already resolved by the pre-trial motions filed in this case, is redundant regarding necessary offense elements as those issues are presented in the joint proposed jury instructions, and is a one-sided, self-serving view of the facts in this case.

Nevertheless, the Defendant will address one specific issue raised in the government's trial brief as the issue has been discussed orally and in e-mail correspondence between the parties, and requires Court intervention prior to trial.[1] The issue raised herein is that the

---

[1] For the issues not raised in this response, Defendant will be prepared to discuss orally at the pre-trial conference. However, it should be noted that one of the issues raised by the government, its charging decision and whether it was politically motivated, Government's Trial Brief at 17-18, has not been raised by the Defendant in this case in any stage of the proceeding.

1

Defendant seeks to admit statements made in a tape-recorded, transcribed interview of deceased co-defendant Doug Wead in this case during cross-examination of the case agent to provide critical background and context to the alleged conduct in this case and the government has indicated it will object to that line of examination and the admission of those statements. The government objects even though it has sought to introduce pre-conspiracy conduct evidence involving Mr. Wead and his dealings with the Foreign National in this case, Roman Vasilenko. *See* ECF No. 32. The government has alleged that Mr. Wead and Mr. Benton provided a "cover" story for the conduct in this case, and Mr. Wead's statements directly challenge that allegation and must be admitted for Mr. Benton to be able to adequately defend himself in this case.

## II.     Factual Background

On May 27, 2021, FBI agents Erin Phan and Kurt Silver interviewed deceased co-defendant Doug Wead. The interview was recorded and reduced to a transcript. *See* Exhibit 1. The interview took place prior to the FBI's execution of a search warrant of Mr. Wead's home.

During the interview, Mr. Wead explained the factual background of how he knew and worked with Mr. Vasilenko, including speaking engagements in Russia that Mr. Wead participated in at Vasilenko's request because he was a prominent speaker on network marketing and that was the field that Mr. Vasilenko was in. Exhibit 1 at 5, 14-18.

Mr. Wead stated that Mr. Vasilenko was interested in doing similar work to Mr. Wead's regarding the Charity Awards in the United States, which was for a period of time very successful with former Presidents, First Ladies, and celebrities involved. Mr. Wead stated that "[h]e [Mr. Vasilenko] was wanting to get involved in charities helping a hospital in St. Petersburg," and Mr. Wead stated that he wanted to revitalize the Charity Awards in the United States and assist Mr. Vasilenko with starting one in Russia, stating that "I went back on one of

those trips to Russia uh Olga (translator) was saying, telling me about his work with the children in St. Petersburg and all of this sort of thing and he wants to get involved in a charity.  And I said well we should have a Charity Awards event and described what it was." *Id*. at 18.

Mr. Wead stated that part of the reason why Mr. Vasilenko came to the United States in September 2016 was to receive an award from Mr. Wead and be recognized for his charity work, and "for him [Vasilenko] the purpose of the award was to be honored in front of his people and everything." *Id*. at 16.  Mr. Wead stated that recognition was very important to Mr. Vasilenko because it gave him "credibility" and "I understood the network marketer and how it's important to have credibility to be honored in front of his own people.  I understood that psychology." *Id*. at 20.

The following question and answer demonstrates the importance of the factual background in this case:

| KS: | So he viewed like… being involved in a charity in the U.S. as a springboard to launching similar stuff in Russia? |
|---|---|
| DW: | Did he what? |
| KS: | He viewed- |
| DW: | [OV] Yes, yeah that was the whole purpose. |

*Id*. at 19.

Mr. Wead said he honored Mr. Vasilenko in 2016 when he came to the United States, and did so again when he came to the United States during a subsequent visit to a private Christian school that Mr. Wead was involved with.  *Id*. at 15.  In connection with the 2016 trip, during the planning process Mr. Wead talked about meeting a celebrity to bolster Mr. Vasilenko's credibility, and the initial celebrities mentioned had nothing to do with American politics.  In

fact, the two celebrities that were initially discussed were Oprah Winfrey and Steven Segal. *Id*. at p. 23. After those two celebrities were discussed, it was Mr. Wead, not Mr. Benton, who had not yet entered the matter, who recommended former President Trump. *Id*. Mr. Vasilenko "got very excited about that one." *Id*.

In addition to the critical contextual information provided by Mr. Wead as to how he knew Mr. Vasilenko and his prior business dealings, Mr. Wead's statement shows how and why Mr. Benton was contacted and the value he provided to the pre-existing relationship between Mr. Wead and Mr. Vasilenko going forward.

Specifically, Mr. Wead stated that after he contacted Mr. Benton he referenced the event in Philadelphia and that he could arrange a photograph with the former President. *Id*. at p. 27. Mr. Benton also told Mr. Wead that he would speak with legal counsel about the visit. *Id*. at p. 28. When pressed about the event with the former President, Mr. Wead again referenced the reason why Mr. Vasilenko came to the United States:

> EP: He was expecting the money so he was expecting Roman to give money, and then he was going to give money - Jesse was going to take that money and then give money to the campaign or to the RNC - whoever was hosting the event, right?
>
> DW: Well, I don't know. I don't know how-how that's worded without talking to Jesse's attorney and I don't know if that's the-the right description. But the point was we wanted to honor Roman Vasilenko. He wanted to go home with a picture with a celebrity and launch his own charitable stuff - still does, still wants to launch that. And Oprah Winfrey would have been great and Steven Seagal would've been great.

*Id*. at 29.

Mr. Wead was again pressed as to what value Mr. Benton was bringing to Mr. Vasilenko, and Wead responded that Mr. Benton had "political knowledge" and "convention planning knowledge" and "how to get celebrities in America that c-could come over." *Id*. at 33. Mr.

4

...

Wead continued and stated that "[m]aybe he'd put together a plan to help get Oprah or Steven Segal or some of these people." *Id*.

When pressed again by the FBI that the invoice that Mr. Benton sent for his work was a "cover" Mr. Wead stated that "[s]omeone who can uh get you in the room with Donald Trump can do much more." *Id*. at p. 35.

At this stage in the interview, as Mr. Wead wasn't given any rights warnings in the beginning of the interview, FBI Agent Phan warned him that "lying to a federal agent is a crime," and Mr. Wead stated that he is honest and telling the agents the truth. *Id*. at p. 36. The interview continued for a significant period of time after this warning.

### III.   Argument

The government asserted in its trial brief that Mr. Wead's statements to the FBI are hearsay and should not be admitted. Government's Trial Brief, p. 15-17. In this case, although it is acknowledged that the typical hearsay exceptions do not apply to these statements, Mr. Wead's statements in this recorded transcript are admissible hearsay under the residual hearsay exception pursuant to Federal Rule of Evidence 807.

Federal Rule of Evidence 807 states that a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804 if: "the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement," and "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."[2]

---

[2] The Rule also contains a notice provision, and the Defendant has informed the government of the intent to cross-examine Agent Phan with Mr. Wead's statements, and admitting those statements, leading to its arguments in the trial brief.

The residual hearsay exception "was designed to encourage the progressive growth and development of federal evidentiary law by giving courts the flexibility to deal with new evidentiary situations which may not be pigeon-holed elsewhere." *United States v. Slatten*, 865 F.3d 767, 806 (D.C. Cir. 2017) (citing *United States v. Mathis*, 559 F.2d 294, 299 (5th Cir. 1977) and *Dallas Cty. v. Commercial Union Assoc.*, 286 F.2d 388 (5th Cir. 1961)). *Slatten* cited the Federal Rules of Evidence Advisory Committee, which stated that "while they [Rules 803 and 804] reflect the most typical and well recognized exceptions to the hearsay rule, may not encompass every situation in which the reliability and appropriateness of a particular piece of hearsay evidence make clear that it should be heard and considered by the trier of fact." *Slatten*, 865 F.3d at 806 (citing FED. R. EVID. 803(24) (advisory committee's note to 1974 enactment)); *Dallas County*, 286 F.2d at 397 ("[t]here is no procedural canon against the exercise of common sense in deciding the admissibility of hearsay evidence.").

*Slatten* acknowledged that "we also recognize that the residual hearsay exception is "extremely narrow and require[s] testimony to be 'very important and very reliable.'" *Slatten*, 865 F.3d at 806 (citations omitted). In *Slatten*, the Court held that the proffered evidence was admissible under Rule 807 because the statement was given as part of a State Department briefing in which 18 U.S.C. §1001 applied, which the Court stated "bolsters the trustworthiness of a declaration for the residual hearsay exception." *Id*. (citing *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 964 F.2d 1308, 1312-13 (2nd Cir. 1992) (holding that hearsay statement was reliable because, inter alia, declarants "faced possible criminal sanctions for making false statements" under 18 U.S.C. § 1001)).

*Slatten* also stated that "we are not aware of evidence 'more probative on the point for'" which Slatten seeks to admit his co-defendant's statements, because the statements contradicted

6

the homicide count against Slatten and the required *mens rea*. *Slatten*, 865 F.3d at 809. Thus, the Court held that "[a]llowing the jury to weigh the statements—to determine their weight, if any, as against the evidence incriminating Slatten—advances the Federal Rules of Evidence's goal of "ascertaining the truth and securing a just determination." *Id.* (citing Federal Rule of Evidence 102); *see also United States v. Sanchez-Lima*, 161 F.3d 545, 547-48 (9th Cir. 1998) (cited by *Slatten* for the reversal of the district court's refusal to admit statements under Rule 807 where, inter alia, the statements in question were made "under oath and subject to the penalty of perjury," were made voluntarily, were based "on facts within [the declarants'] own personal knowledge" and "did not contradict any of their previous statements to government agents and defense investigators").

After *Slatten*, Rule 807 was significantly streamlined in 2019 to remove the requirement that the proffered evidence have equivalent circumstantial guarantees of trustworthiness comparable to Rules 803 and 804, and the amendment requires courts to "proceed directly to a determination of whether the hearsay is supported by guarantees of trustworthiness." *See United States v. Smith*, 2020 WL 5995100, *5 (D.D.C 2020). *Smith* also stated that "[t]he 2019 changes to Rule 807 leave some doubt, however, as to whether the residual hearsay exception remains "extremely narrow."" *Id.* (citing Daniel J. Capra, Expanding (or Just Fixing) the Residual Exception to the Hearsay Rule, 85 Fordham L. Rev. 1577 (2017) (cited by *Smith* regarding the effort to amend Rule 807 which culminated in the 2019 amendments and stating that one of the aims was "to allow the admission of more hearsay if it is reliable")). *Smith* ultimately concluded that the evidence must still "be very important and very reliable" to be admitted under the rule. *Smith*, 2020 WL 5995100 at *5.

The statements by Mr. Wead in this case are both very important and very reliable. As an initial matter, there are sufficient guarantees of trustworthiness of Mr. Wead's statement – it was an interview conducted by two FBI agents that was contemporaneously recorded and transcribed. Furthermore, Mr. Wead was warned that lying to a federal agent was a crime, and he continued to speak with the agents after the warning, which provides additional indicia of reliability because Mr. Wead was aware of the consequences for not answering questions truthfully.[3]

There is also significant publicly available corroboration of the information Mr. Wead provided regarding his past involvement with the Charity Awards in the United States which render his statements about his involvement and desire to assist Mr. Vasilenko with that work credible. *See, e.g.*, Washington Post, Faith, Celebrities Charity, July 31, 1990 https://www.washingtonpost.com/archive/lifestyle/1990/07/31/faith-celebrities-charity/06669e3a-d49a-4c39-af76-2ac21b93ea4a/ (last visited October 24, 2022) (recap of Charity Award event that raised $700,000 for charities and referenced Mr. Wead as a co-founder of the Charity Awards dinner); https://charityawards2010.weebly.com/ (last visited October 24, 2022) (2010 Charity Awards honorees and listing Mr. Wead as co-founder of Charity Awards). Therefore, based on the totality of the circumstances in this case, the statement has more than sufficient trustworthiness.

With respect to Rule 807's requirement that the evidence be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts," or the "important" prong, there is no other more probative way to present this critical evidence. Mr. Wead is deceased[4], and Mr. Vasilenko is presumably in Russia and will not be a

---

[3] The government did not charge Mr. Wead with any false statement offenses prior to his death.
[4] Had Mr. Wead been alive for the trial, a motion to sever would have been filed to seek introduce as evidence the statements he provided to the FBI if he did not testify in a joint trial.

witness in this case. There are no other witnesses that are available that can testify to the historical business context between the two individuals – the indictment alleges that Mr. Vasilenko was a "business associate" of Mr. Wead's, and the statements provide factual background for that relationship. Indictment, ¶ 11. This background information provides evidence regarding the most critical issue in this case – *why Mr. Vasilenko came to the United States in 2016*.

Critically, there is no available witness who can testify or provide evidence that Mr. Wead and Mr. Vasilenko discussed other celebrities such as Oprah Winfrey or Steven Segal before former President Trump was even mentioned as a potential celebrity to meet. This context is extremely important because it further demonstrates that the purpose of Mr. Vasilenko's 2016 visit was not to make a contribution to influence a federal election and "illegally funnel" money into the former President's campaign, but to get a picture with a celebrity and bolster Mr. Vasilenko's credibility in his home country as a respected businessman.

This critical information would support a jury's finding of reasonable doubt regarding the purpose of the trip and therefore the alleged conspiracy. *See United States v. Thomas*, 189 Fed. Appx. 219, 225 (4th Cir. 2006) (unpublished) (any error in not allowing post-arrest statement of co-defendant was harmless because the statement incriminated the defendant and replaced the co-defendant with another individual and the defendant offered no theory as to how the statement "could have possibly created reasonable doubt sufficient to acquit"). In this case, there is a clear theory on how the statement would create reasonable doubt – if the jury is made aware of the historical context and the purpose for the visit and sees this case for what it truly is – a picture with a celebrity, there will be sufficient grounds for reasonable doubt in this case.

Furthermore, the necessity for the admission of Mr. Wead's statement is obviously high because of his death – indeed, "[w]hen the co-conspirator has died before trial, there is greater justification to lay aside the hearsay rule, because there is greater necessity. Unless exception is made to the general hearsay rule, there is a risk that the evidence contained in the extra-judicial statements of a deceased co-conspirator would be lost entirely. *See United States v. Weber*, 437 F.2d 327, 336 (3rd Cir. 1970) (admission under co-conspirator exception to the hearsay rule). Furthermore, in *United States v. Zannino*, 895 F.2d 1, 7-8 (1st Cir. 1990), the Court stated that the prior testimony of a deceased government witness was "plainly material," and "highly probative" because the witness had "personal knowledge of the matters at issue, unique in some respects," and with him dead, "his personal knowledge could best be tapped by resort to his earlier testimony" and was thus admissible under the predecessor to Rule 807.

In this case, the government is seeking to have pre-conspiracy conduct between Mr. Wead and Mr. Vasilenko admitted, but objecting to that information coming directly from Mr. Wead in a recorded statement with the FBI. In its omnibus pre-trial motion, the government asserted that "[t]he evidence prior to the formation of the conspiracy at issue in this case provides important context and background for the formation of the conspiracy and illuminates the conspiracy's unlawful purpose," and "[t]o omit the earlier developments between Wead and Foreign National 1 from the evidence would unnaturally truncate the version of events presented to the jury and would deprive the jury of important information regarding the true nature of the criminal scheme." ECF No. 32 at 10.

The Defendant agrees with the government but contends the exact opposite as the reason why the statements should be admitted – that the prior evidence actually shows the *lawful* purpose of Mr. Vasilenko's trip to the United States in 2016, and to omit these statements will

deprive the jury of important information regarding that lawful purpose. In fact, the government alleged in the Indictment that the Charity Awards was the "cover story" for the alleged conspiracy in this case, specifically Mr. Vasilenko's desire to start a Charity Awards in Russia. Indictment, ¶ 40(c). By labeling Mr. Wead's statements "self-serving," the government appears to be cherry picking which of the past context conduct it seeks to have the jury hear about and what it cannot which improperly invades the jury's function in this case to make a determination based on all relevant facts and the government cannot block the jury from making this determination.

Without this evidence, the jury will receive half or even less of the complete picture in this case, all colored by the government's alleged nefarious purpose without the ability for the Defendant to counter or challenge that narrative with the only evidence it has available. In short, due to death and geography, the Defendant is hamstrung, thus the recorded transcript is the only way to present this evidence fairly and completely before the jury. This very unique circumstance is the exact circumstance for which Rule 807 is intended for important and reliable evidence to be admitted to support the Defendant's ability to defend himself.

### IV.     Conclusion

Wherefore, it is respectfully requested that the Court permit the cross-examination of Agent Phan regarding Mr. Wead's recorded statements in this case and permit the introduction of those statements into evidence.

Dated: October 27, 2022                     Respectfully submitted,

                                                          By: */s/ Brian W. Stolarz*
                                                               Brian W. Stolarz (D.C. Bar No. 466160)
                                                               Norton Rose Fulbright US LLP
                                                               799 9th Street, NW, Suite 1000
                                                               Washington, DC 20001-4501
                                                               Telephone: (202) 662-0309
                                                               Facsimile: (202) 662-4643
                                                               Email: brian.stolarz@nortonrosefulbright.com
                                                               *Counsel for Defendant Jesse R. Benton*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that this document filed through the CM/ECF system on October 27, 2022, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Brian W. Stolarz*
Brian W. Stolarz
