UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JESSE R. BENTON<br><br>                Defendant. | Case No. 1:21-cr-00569-TNM |

**UNITED STATES' OPPOSITION TO DEFENDANT'S PROPOSED CO-DEFENDANT STATEMENTS FOR ADMISSION**

Defendant Jesse R. Benton ("Defendant") seeks to admit under Federal Rule of Evidence 807 ten statements made by now deceased co-defendant Roy Douglas "Doug" Wead ("Wead") during his confrontational interview with the FBI. But these statements are inadmissible hearsay, are unreliable, and would only serve to mislead and distract the jury. The Court should preclude Defendant from introducing the proposed statements.

**A. Rule 807 Remains An Extremely Narrow Exception to the Rule Against Hearsay**

In order for a statement to be admissible under Rule 807, it must be "supported by sufficient guarantees of trustworthiness--after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement" and be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807.

The D.C. Circuit has called Rule 807 an "extremely narrow exception" that it applies "sparingly, only in the most exceptional circumstances, and only if the out-of-court statement is both very important and very reliable." *United States v. Mason*, 951 F.3d 567, 574 (D.C. Cir.

2020) (internal quotations omitted).[1]  In *Mason*, in the context of a discussion of prejudice relating to the late disclosure of information provided by a deceased individual, the D.C. Circuit rejected an argument that statements by that individual to the defense would have been admissible, noting "[s]uch statements would have been obvious hearsay if offered for the truth of the matter asserted . . . and inadmissible at trial unless subject to an enumerated hearsay exception." *Id.*  The D.C. Circuit specifically rejected the idea that the statements would have been admissible under Rule 807, noting that they would have been of "doubtful reliability."  *Id.*; *see also United States v. Washington*, 106 F.3d 983, 1001–02 (D.C. Cir. 1997) (noting that the proponent of a statement under Rule 807 "bears a heavy burden to come forward with indicia of both trustworthiness and probative force."); *United States v. Bruguier*, 961 F.3d 1031, 1033 (8th Cir. 2020) (finding no abuse of discretion where district court refused to allow defendant to introduce recorded statement his girlfriend made to the FBI prior to her death because statement was made nine months after the episodes of abuse, girlfriend was not under oath, and "there is good reason to doubt a person who knows her romantic partner is accused of committing a serious crime."); *United States v. Wright*, 363 F.3d 237, 246 (3d Cir. 2004) (Alito, J.) (finding district court did not commit clear error in excluding statements made by deceased individual to his lawyer because declarant's statements were "***self-serving statements made at a time when he knew he was under investigation and had a motive to not tell the truth***.  Human nature is to deny committing crimes, especially for a public figure who is held in high esteem by the community and knows he is under investigation.") (emphasis added).  Indeed, "[c]ourts must use caution in applying the residual

---

[1]   Notably, *Mason* was decided after the 2019 amendments to Rule 807, which strongly suggests that those amendments did not change the case law in the D.C. Circuit as previously suggested by Defendant.

2

exception because "an expansive interpretation of the residual exception would threaten to swallow the entirety of the hearsay rule." *United States v. Hammers*, 942 F.3d 1001, 1011 (10th Cir. 2019).

**B. Wead's Statements to Law Enforcement Were Not Trustworthy**

Defendant wishes to introduce numerous statements from Wead's interview with the FBI. However, contemporaneous emails, seized from Wead's email account, contradict the statements Wead made to law enforcement and underscore that those statements were not truthful or trustworthy with regard to several subjects.

### i. Vasilenko's Charitable Work

During his interview with the FBI, Wead claimed that Olga Kovalova, Wead's Russian/English translator, told Wead about charitable work done by Vasilenko, and Wead was then inspired to host a Charity Awards event in his honor. Wead Transcript, ECF No. 48, Exh. 1 at 18-20. But this is belied by the actual email record. In September 2015, Vasilenko invited Wead to travel to Moscow in January 2016, to attend an event and receive a $10,000 payment. Kovalova/Wead Email, attached hereto as Exhibit A. On January 6, 2016, just before Wead traveled to Moscow to meet with Vasilenko, Wead reached out to Kovalova and stated, "Olga…if you get a chance, before you go to [M]oscow….take a look at this website and thoroughly acquaint yourself with it. You remember the dinner. We are having another this year and there may be a way we can be helpful to Roman." Kovalova/Wead Email, attached hereto as Exhibit B. Wead then went on to state, "Sometime, during our stay, I would like to have ten minutes alone with you and Roman, to share about this…We are honoring former president jimmy carter [sic] this year and it is turning into quite a big deal." *Id*. In other words, contrary to Wead's representations in his interview, Wead claimed to Kovalova that he was already planning on hosting a dinner

3

(honoring Jimmy Carter), and Wead initially proffered the dinner as a way to "help" Vasilenko, rather than as a result of learning about any charitable work done by Vasilenko.

Indeed, shortly after Wead's trip to Russia, Wead sent an email to Dave Donaldson, who had previously served on the board of Charity Awards, and told him "Dave, look this over and call me back asap to discuss. I just spoke for this gentleman in Moscow. We are seeking some start-up money to pay Camille, hire Cori and pay my own expenses." Donaldson/Wead Email, attached hereto as Exhibit C. Thus, according to the email record, the purported Charity Awards event that Wead was planning had no charitable purpose at all. This is backed up by bank records obtained for Charity Awards which reflect that a majority of Vasilenko's original $100,000 in fact went to Wead's two daughters and Wead, and not to any charitable purpose.

Far from seeking to honor Vasilenko for his charitable efforts, the email record reflects that Wead initially offered Vasilenko the opportunity to buy an award. On January 15, 2016, Wead emailed Kovalova a memo for Vasilenko, explaining the various options for the supposed event. Kovalova/Wead Email, attached hereto as Exhibit D. The email laid out three levels of giving: for $30,000 Vasilenko could get an award presented by a celebrity; for $60,000, he could additionally join with three other co-chairmen in giving Jimmy Carter the Humanitarian of the Year Award, and for $100,000 Vasilenko could receive the "Annual Charity Businessman of the Year" award. *Id.* It is clear from the email that Wead viewed Vasilenko's charitable works as entirely aspirational. *Id.* A little less than a month later, on February 7, 2016, Kovalova wrote Wead that Vasilenko wanted to "get a Business Award and is ready to pay $100000." She followed up with, "See, if I am promised 10 percent I can persuade a person to pay any amount of money." Kovalova/Wead Email, attached hereto as Exhibit E. Contrary to Wead's statements in his interview, the event was Wead's idea, not Vasilenko's. *See* ECF No. 48, Exh. 1 at 18-19.

4

### ii.     Vasilenko's Desire To Meet a Celebrity

After sending Vasilenko wiring instructions and an invoice for his $100,000 "donation," Wead sent an email to Vasilenko giving him a list of celebrities, and asking who he wanted to meet at the event. Kovalova/Wead Email, attached hereto as Exhibit F. Wead came up with the initial list, and caveated the list by saying, "Some dates will be in conflict with these folks and some will be unavailable or reject the invitation. They are all under consideration by the Committee and we are talking to some to learn more about their charity work but none have been formally invited." *Id.* In response, Kovalova emailed Wead that Vasilenko "would be happy to meet Oprah, Steven Seagal, Vladisav Tretyak and President Carter." Kovalova/Wead Email attached hereto as Exhibit G. In his interview with the FBI, Wead incorrectly claimed that Vasilenko had come up with the list of celebrities that he wanted to meet and that Donald Trump was on that initial list. ECF No. 48, Exh. 1, at 23-24.

### iii.     The Significance of Vasilenko's Initial $100,000 "Donation"

Vasilenko wired $100,000 to the Charity Awards bank account on April 1, 2016. During his interview Wead tried to minimize the amount that Vasilenko gave and claimed that "[i]t wasn't a huge amount of money. We didn't have a big event." ECF No. 48, Exh. 1, at 16. But bank records reflect that Vasilenko's $100,000 donation was the only significant source of funds to the Charity Awards bank account from 2016 through 2019. Wead claimed in his interview with the FBI that the "purpose" of the 2016 Charity Awards event was to "build a relationship with this great organization in Russia" and specifically to give Vasilenko credit for his interest in getting involved in charities helping a hospital in St. Petersburg. *Id.* Wead further claimed that the genesis for the event came during one of his trips to Russia when Kovalova was "telling me about [Vasilenko's] work with the children in St. Petersburg." *Id.* at 18. But the email record reflects

5

that Wead had no knowledge of any charitable work done by Vasilenko at the time he initially floated the idea of the event. Kovalova/Wead Email, attached hereto as Exhibit H. On July 18, 2016, Wead emailed Kovalova, "[I]t would be very helpful to have info on any charitable work that Roman or his organization has done." *Id.* Wead followed up that same date with a second email. Kovalova/Wead Email, attached hereto as Exhibit I. In that email Wead again told Kovalova, "Don't forget the pictures and anything you can get about charity work he may have done." *Id.* As demonstrated by the contemporaneous email traffic, as of July 2018, approximately three months after Wead had agreed to give Vasilenko an award at the Charity Awards event, Wead had little, if any, familiarity with Vasilenko's charitable work. *Id.* On August 2, 2016, Wead sent an email to an individual who ran his website and asked her to add Vasilenko to the website as the 2016 Winner of the Humanitarian Award.[2] Wead Email, attached hereto as Exhibit J. In that write up, there was no mention of a hospital in St. Petersburg or autism, just the claim that Vasilenko was "working to bring a Charity Awards program to Eastern Europe and Russia to help honor heroes of volunteerism."[3] *Id.* In emails subsequent to the Charity Awards event, Wead did not even acknowledge the 2016 Charity Awards as an actual event. In 2017, in an email to a friend, on which he cc'd Defendant, Wead wrote, "I haven't raised a dime in 40 years. Ha. The Charity Awards is an awards celebration and we don't actually raise money at the event. And our last one was in 2001." Wead Email, attached hereto as Exhibit K.

---

[2]   In prior correspondence that award was supposedly going to President Jimmy Carter.

[3]   As Wead acknowledged in his interview with the FBI, Vasilenko was removed from the Charity Award's website at some point after 2016 to "protect the name of the Charity Awards" after all of the "Trump is a Russian spy" publicity. ECF No. 48, Exh. 1, at 61. There is no evidence that Vasilenko ever started a Charity Awards program in Eastern Europe or Russia.

### iv.   Wead's Understanding of the Source of the Political Contribution

During his interview with the FBI, Wead initially claimed that Defendant told him that Defendant would "make a contribution" to get Vasilenko a seat at the table with Trump. ECF No. 48, Exh. 1, at 28. But after the event in Philadelphia, when they were still waiting for the official photographs from the event, Wead wrote Defendant, "I think I could have gotten a couple more $100,000 donations but how can I do it when I know they won't get their photos?"[4] Wead/Benton Email, attached hereto as Exhibit L. By referring to additional "$100,000 donations" that Wead could have gotten for a photo, Wead appears to be acknowledging that Vasilenko was the true source of the funds. On December 15, 2016, Wead wrote Defendant, "Do you know, if through the money we steered to the cause, are Myriam [Wead's wife] and I . . . listed as contributors anywhere? To the PAC or the Campaign? And if so, how much are we credited?"[5] Wead/Benton Email, attached hereto as Exhibit M. This email again confirms that Wead believed that he and Defendant had "steered" money to the cause – i.e., facilitated a contribution by Vasilenko.

### v.   Cost of the Meeting with Trump

Wead did not tell a consistent story regarding the cost of the event in his interview with the FBI. Although earlier in the interview, Wead claimed that Defendant told him the event would cost "in the area of about" $40,000-$50,000, ECF No. 48, Exh. 1, at 29, later in the interview, after being extensively questioned about why Vasilenko had paid Defendant $100,000, Wead changed

---

[4]   When questioned about a similar email during his FBI interview, Wead agreed that his reference to other individuals paying $100,000 was for a political contribution and that the money would be going to a political event. But he continued to deny that Vasilenko's funds were similarly a contribution. See ECF No. 48, Exh. 1, at 41-43.

[5]   During his interview Wead claimed to not know what he was referring to in this email. ECF No. 48, Exh. 1, at 54-55.

his story, and claimed that Defendant "had some spots because he had raised money for Trump" and that he could "get . . . Roman into one of those spots." *Id.* at 65. Wead admitted that he knew it would be "problematic" if Vasilenko contributed to a Presidential campaign. *Id.* at 70.

### vi. Vasilenko's Role with Regard to Canyonville Christian Academy

In 2018, Wead hosted another event where he again honored Vasilenko, this time at Canyonville Christian Academy, a private high school in Oregon where Wead served as President. In his interview, Wead stated that Vasilenko came to Oregon to "help" with the school. ECF No. 48, Exh. 1, at 12, 14. However, email records reflect that Wead also called the Canyonville Christian Academy event the "Charity Awards," and that Vasilenko received another award at the event in addition to an honorary doctorate in economics (even though the school was a high school). Wead Emails, attached hereto as Exhibits N, O. In 2018, Vasilenko did not make a donation to Charity Awards.[6]

### C. Wead's Proffered Statements Are Inadmissible Under Rule 807

Defendant seeks to introduce numerous irrelevant and untrustworthy statements by Wead. Because Wead's interview included numerous factual inaccuracies, and Wead had a motive to lie to the FBI about his conduct, this Court should decline to allow any of these statements into evidence under Rule 807. *See Mason*, 951 F.3d at 574 (statements allowed in under Rule 807 "only if the out-of-court statement is both very important and very reliable.") (citation and quotation marks omitted). The United States will address the issues with each proposed statement in turn.

---

[6] The record is unclear as to whether Vasilenko gave money for the event to Canyonville Christian Academy.

### i. Statements 1(a) to 1(c)

In statements 1(a) and 1(b) Defendant seeks to introduce two statements relating to Wead's relationship with Vasilenko. ECF No. 50 at 2. As laid out in detail above, Wead repeatedly lied to agents about his relationship with Vasilenko. Wead's statements regarding the relationship are therefore not trustworthy and not admissible under Rule 807. *See Mason*, 951 F.3d at 574. Moreover, it is difficult to see how Wead's initial introduction to Vasilenko (which by Wead's account took place before the Sochi Olympics in 2014) or the fact that at the time Vasilenko was sharp and well-dressed is a fact of consequence to the action and therefore relevant. *See* Fed. R. Evid. 401.

Defendant also seeks to introduce as statement 1(c) statements relating to the purported purpose of Mr. Vasilenko's travel to the United States in 2018. ECF No. 50 at 2. But the indictment relates to a 2016 trip by Vasilenko to the United States, and the conspiracy is not alleged to continue into 2018. Thus Wead's statements regarding Roman Vasilenko's trip to Canyonville Christian Academy in 2018, two years after the events alleged in the present case, are similarly not relevant to any issue that the jury has to decide. *See* Fed. R. Evid. 401.

### ii. Statement 2

Defendant seeks to introduce Wead's statements claiming that he was inspired to have a Charity Awards event in 2016 based on Vasilenko's purported work with children in St. Petersburg, and that he encouraged Vasilenko to do a charity event in Russia. As described in detail above, Wead's claims during his interview regarding Vasilenko's interest in charity work and his work with children are belied by the contemporaneous email record. The email record reflects that Wead knew very little about Vasilenko's charitable work until July 2016, over six months after he first floated the idea of a Charity Awards event to Vasilenko. Exhibits H, I. Even

after specifically requesting information regarding Vasilenko's charitable interests, the best Wead could muster to justify Vasilenko receiving the "Humanitarian of the Year" award in 2016 was a claim that he was supposedly "working to bring a Charity Awards program to Eastern Europe and Russia to help honor heroes of volunteerism." Exhibit J.

There is no support in the email record for the idea that Wead initially encouraged Vasilenko to host a Charity Awards event in Russia. To the contrary, Wead approached Vasilenko with the idea that Vasilenko would take part in an event in the United States. Exhibit B. Other than Wead's statements justifying the award to Vasilenko (and the invoice from Defendant), there is no evidence that Vasilenko had any interest in starting a Charity Awards in Russia or took any steps to do so. Rather, from the email record it seems clear that Vasilenko wanted an award and was willing to pay for it, and Wead wanted Vasilenko's money for personal purposes and was willing to invent a reason for giving Vasilenko an award through his basically defunct charity. The statements that Defendant wishes to introduce are not truthful and misleading given the full email record and are therefore inadmissible. *See* Fed. R. Evid. 807, 403.

### iii. Statements 3(a) to 3(c)

Statements 3(a) and 3(b) are similarly contradicted by the actual contemporaneous email record. Vasilenko did not have a pre-existing charitable organization in Russia, and there is no mention in any of the email traffic of any involvement by Vasilenko with a hospital in St. Petersburg. *See, e.g.,* Exhibits B, D, H, I, J. Indeed, Wead admitted in his interview that Vasilenko "still wants to launch" "his own charitable stuff" in Russia, suggesting that as of 2021, Vasilenko had yet to do so. ECF No. 48, Exh. 1, at 28. Statements 3(a) and 3(b) are not reliable and should not be admitted.

Statement 3(c) occurs in the interview just as agents began to confront Wead with his criminal conduct. Immediately before statement 3(c), Wead admitted that he had reached out to Defendant regarding a meeting for Vasilenko with then candidate Donald Trump. ECF No. 48, Exh. 1, at 27. He then stated, "Well uh [Defendant] said there's an event in um uh Philadelphia, and we could get Donald Trump, or Donald Trump is going to be at that event and uh…I-we could get him a seat at the table. **I could make a contribution and I could get him a seat at the table and we could uh meet Trump**." *Id.* at 27-28 (emphasis added). The agent then followed up and asked if Defendant said he would make a contribution. *Id.* at 28. Wead claimed that he was "not completely sure how that went" and that Defendant told him that he had "a lawyer that would go through step by step of what would happen and how it would work." After the agent followed up again, Wead again disclaimed knowledge and did not provide a further answer to the question. *Id.* Given the circumstances, these statements are of doubtful reliability. *See Mason*, 951 F.3d at 574. Indeed, these are precisely the type of "self-serving statements made at a time when he knew he was under investigation and had a motive to not tell the truth" that Courts have excluded. *Wright*, 363 F.3d at 246 (citation and quotation marks omitted).

    iv.  Statements 4(a) to 4(c)

Defendant wishes to introduce Wead's claim that Defendant could "put together a plan to help get Oprah or Steven Seagal" to come to Russia. This statement is preposterous, and there is absolutely no support in any record for it. Moreover, earlier in the interview, Wead made clear why he contacted Defendant, when he stated "I didn't have any connection to Donald Trump….So I contacted…Jesse Benton…who had been the…campaign manager for the Ron Paul Presidential Campaign…and I asked him…I think he was doing some work for the Trump…campaign." ECF No. 48, Exh. 1, at 24. In other words, early in the interview Wead admitted that Defendant's role

11

and purpose was to connect Vasilenko with Donald Trump. That Wead contacted Defendant for the purposes of brokering a meeting between Vasilenko and Trump is supported by other evidence in the record.

Only after being confronted with the fact that the event required a contribution, ECF No. 48, Exh. 1, at 28, and the invoice created by Defendant that claimed he was being paid to do consulting work, *Id.* at 32, did Wead mention the work Defendant supposedly was going to do for Charity Awards. These rationalizations and explanations, which are reflected in 4(b) and 4(c), and which Wead gave after being confronted, are also precisely the type of "self-serving statements made at a time when he knew he was under investigation and had a motive to not tell the truth" that Courts have excluded. *Wright*, 363 F.3d at 246 (citation and quotation marks omitted).

If Defendant wishes to introduce his value and purpose, he has the option to take the stand and explain that himself to the jury. Wead's statements are therefore not "more probative on the point for which [they are] offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807; *see also United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) (hearsay rules forbid defendant from being able to place his own hearsay statements "before the jury without subjecting [himself] to cross-examination.") (citation and quotation marks omitted).

### D. If Wead's Statements Are Admitted, The United States May Impeach Him Under Rule 806

Finally, should the Court allow Defendant to introduce the requested statements under Rule 807, the United States will be entitled to attack Wead's credibility "by any evidence that would be admissible for those purposes if the declarant had testified as a witness." Fed. R. Evid. 806. The United States would therefore be entitled to introduce all of the inconsistent statements from Wead's interview, all of the inconsistent emails, bank records, and other documents that would

undermine Wead's credibility.  The United States respectfully submits that such an exercise would quickly turn into a mini-trial regarding Doug Wead's statements during the FBI interview.  But Doug Wead is not on trial; the Defendant is.  Wead's statements are inadmissible under Rule 807 and would only serve to distract the jury.

## CONCLUSION

The government respectfully requests that the Court deny Defendant's request to introduce Wead's interview statements.

Respectfully submitted,

Corey R. Amundson
Chief
Public Integrity Section

By: /s/ *Michelle L. Wasserman*
Michelle L. Wasserman
Special Assistant United States Attorney
United States Attorney's Office for the
District of Columbia

Rebecca G. Ross
Michelle K. Parikh
Trial Attorneys
Public Integrity Section
Criminal Division
U.S. Department of Justice

## **CERTIFICATE OF SERVICE**

I hereby certify that this motion was filed by ECF on November 6, 2022, and thereby served on defense counsel.

/s/ Rebecca G. Ross
Rebecca G. Ross
Trial Attorney