UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) |
| JESSE R. BENTON, | )   CRIMINAL NO. 1:21-CR-00569 (TNM) |
| | ) |
| Defendant. | ) |
| _____ | ) |

**DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL OR IN THE
ALTERNATIVE MOTION FOR NEW TRIAL**

COMES NOW the Defendant, Jesse Benton, through counsel, and moves for judgment of acquittal on counts 1 through 6 pursuant to Federal Rule of Criminal Procedure 29(c).

Alternatively, Mr. Benton requests this Court vacate the verdicts on those counts and grant a new trial pursuant to Federal Rule of Criminal Procedure 33.

**I.**     **Procedural History**

Mr. Benton was charged in a six-count indictment alleging conspiracy pursuant to 18 U.S.C §371, contributions by a foreign national pursuant to 52 U.S.C. §30121, contributions in the name of another pursuant to 52 U.S.C. §30122, and causing false records pursuant to 18 U.S.C. §1519.  Jury selection and trial took place from November 9, 2022 to November 17, 2022.  After approximately 13 hours of deliberations, Mr. Benton was found guilty of all charges.  Sentencing is set for February 17, 2023.

II. **Argument**

    A. **A Motion for Judgment of Acquittal is Appropriate in This Case**

Despite the jury's verdict, the state of the evidence presented at trial in this case did not sufficiently prove a critical element of the offenses in this case – that foreign national Roman Vasilenko's $25,000 contribution was intended to influence a federal election. Mr. Benton adopts and incorporates all arguments made in connection with his motion for judgment of acquittal at the close of the government's case and at the close of the evidence in this case.

After the "jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). A court must determine whether, "viewing the evidence most favorably to the government and according the government the benefit of all legitimate inferences therefrom, a reasonable juror must necessarily have had a reasonable doubt as to the defendants' guilt." *United States v. Weisz*, 718 F.2d 413, 437 (D.C.Cir.1983). Although the court must give the jury verdict a great amount if deference, the verdict must "rest on an adequate foundation." *United States v. Kinard*, 788 F. Supp. 36, 39 (D.D.C. 1992).

Even viewed in the light most favorable to the government, the government failed to present sufficient evidence to sustain a conviction for the offenses in this case, and the evidence does not rest on an adequate foundation. FECA defines "contribution" to include "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person *for the purpose of influencing any election for Federal office*." 52 U.S.C.S. §30101(8)(A) (emphasis added). FECA was designed with the intent to prohibit influencing officials by paying them. *See Buckley v. Valeo*, 424 U.S. 1, 26 (1976) (stating that FECA's primary purpose is "to limit the actuality and appearance of corruption resulting from large individual financial contributions").

As noted in the motion to dismiss in this case, in *United States v. El-Saadi*, the Government alleged the defendants contributed more than $3.5 million because they hoped that

2

the contributions would "grant them access to and influence with this presidential candidate, which they could then parlay to gain favor with and financial support from the Government of a foreign country." 549 F. Supp. 3d 148, 153 (D.D.C. 2021).

The government did not sufficiently prove FECA's requirement of conduct for the purpose of influencing any election for federal office and did not introduce any evidence that FECA seeks to criminalize such as granting someone access to influence a candidate to gain favor of a foreign country. From the indictment to the evidence in this case, it was very clear what was important to Mr. Vasilenko – a photograph with a celebrity to enhance his image on Instagram. From statements like the photo being important to him to the numerous follow-ups regarding the photograph, this whole case was for a Russian businessman to enhance his image on Instagram by posting a picture of him with a celebrity. Indeed, as discussed numerous times during trial, when Mr. Vasilenko was first approached regarding his visit to the United States, ten celebrities from entertainment, sports, and politics were presented, and former President Trump was not on that list, demonstrating that the 2016 presidential election was not the purpose of Mr. Vasilenko's visit to the United States.

The government's thin, belated justification that Mr. Vasilenko was a Russian politician and therefore knew he was contributing to influence a federal election was not supported by the evidence. Nowhere in the initial Wead communications with Ms. Kovalova is it referenced that Mr. Vasilenko is a politician and that such status would be enhanced by a photo with a political figure. The majority of the individuals proffered were celebrities, and critically, when Mr. Wead asked Mr. Vasilenko to rank the proffered celebrities in order through Ms. Kovalova, there was no reference to Mr. Vasilenko being a politician, rather it reflected a desire to meet Oprah Winfrey, Steven Segal, Vladisav Treytak (Russian hockey goalie), or Jimmy Carter. *Id*. This

initial contact, more than any other evidence, shows the true purpose of Mr. Vasilenko's visit to the United States, his intent to meet a celebrity, and the government's evidence did not sufficiently counter that.

There were two meager references to Mr. Vasilenko and Russian politics, both by third-parties who did not testify, but were included in communications with Mr. Wead. First, in government exhibit 68, the Russian translator Mr. Wead interacted with, Olga Kovalova, stated that Mr. Vasilenko "will participate in the elections to the Russian Parliament on the 18." *See* Exhibit 1. This statement does not state that Mr. Vasilenko was running for office, and participating can mean a number of things, including simply voting or supporting a candidate. Of course, Ms. Kovalova did not testify so there is no way to know what she meant, and therefore the government's extrapolation that Mr. Vasilenko was running for office based on this is improper.

Indeed, the only reference to Mr. Vasilenko running for office is from a third-party, Thomas Sullivan, who did not testify and whose statements were embedded between statements made by Mr. Wead regarding Mr. Vasilenko's visit. In government exhibit 86, Mr. Wead sets forth a biography of Mr. Vasilenko, and nowhere in that biography does it reference that Mr. Vasilenko is running for office in Russia. He is referred to a as a "Russian philanthropist." *See* Exhibit 2. The person Mr. Wead wrote the e-mail to, Thomas Sullivan, wrote to a contact that Mr. Vasilenko was running for political office, but that was not in Mr. Wead's e-mail. *Id*. This off-hand, uncorroborated statement by a third-party cannot support the conviction in this case – there is no open source information available that Mr. Vasilenko ran for office in Russia and the government presented no such evidence.

Finally, the government's reference to post-election correspondence in which Mr. Vasilenko was invited to speak on Russian television regarding President Trump, government's exhibit 76, doesn't show that Mr. Vasilenko's intent was to influence the election, rather he sought the photograph to enhance his image, and it worked because he was asked to speak on television.  *See* Exhibit 3. In no-pre election correspondence is there any reference whatsoever to Mr. Vasilenko seeking to influence the election, and the post-election request to be on Russian TV is more fortunate circumstances than the result of any intent or purpose.

Therefore, the critical element of this case rests on a very thin, shaky foundation that is not supported by the evidence and did not rise to a level that supported a finding of guilt beyond a reasonable doubt. Therefore, a judgement of acquittal is required not just on the contribution and conspiracy counts but counts 4-6 as well as those statements in the FEC reports were not false because of the lack of sufficient proof of purpose to influence a federal election and thus lack of evidence of a contribution.

Furthermore, a judgement of acquittal based on the advice of counsel defense and the lack of evidence of Mr. Benton's willfulness in this case. Despite the government's arguments, Mr. Benton sought his counsel in good faith, presented facts in an e-mail and in a telephone conference, and acted consistent with that advice.  That conduct demonstrates a lack of willfulness by Mr. Benton and is another basis for judgment of acquittal in this case.

  **B.**  <u>**A New Trial is Required in This Case**</u>

Alternatively, Mr. Benton seeks a new trial in this case based on certain rulings of the Court in this case.  Specifically, Mr. Benton seeks a new trial on the following grounds: (1) the Court's granting of the government's motion in limine to admit evidence, specifically Mr. Benton's prior conviction, pursuant to Rule 404(b) of the Federal Rules of Evidence and the subsequent improper argument by the government during closing regarding this evidence; (2) the

Court's granting of the government's motion in limine regarding the proffered evidence concerning the Telegraph evidence that could be used as cross-examination if Mr. Benton testified, and (3) the Court's denial of Mr. Benton's motion to admit co-defendant Doug Wead's statements for admission pursuant to Federal Rule of Evidence 807.

Under Fed. R. Crim. P. 33(a), "upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. The Court evaluates a Rule 33 motion from a different perspective than it evaluates a Rule 29 Motion for Judgment of Acquittal. *United States v. Edmonds*, 765 F. Supp. 1112, 1118-19 (D.D.C. 1991). In a Rule 33 Motion, the Court need not accept the evidence in the light most favorable to the government, and the Court may weigh the testimony and may consider the credibility of the witnesses. *See United States v. Wiley*, 517 F.2d 1212, 1217 n. 24 (D.C. Cir. 1975). The Court may grant a motion for new trial "only where the credibility of the government's witnesses had been impeached and the government's case had been marked by uncertainties and discrepancies." *Edmonds*, 765 F. Supp. at 1118–19.

To meet this burden, a defendant must show that (1) there was a substantial error and (2) the error affected the defendant's substantial rights. *See United States v. Walker*, 899 F.Supp. 14, 15 (D.D.C. 1995) (citing *United States v. Johnson*, 769 F.Supp. 389, 395–96 (D.D.C. 1991)); *see also Kotteakos v. United States*, 328 U.S. 750, 765, (1946) (the inquiry is "whether the error itself had substantial influence").

A court may order a new trial "if the interest of justice so requires." *United States v. Pray*, 869 F. Supp. 2d 44, 46 (D.D.C. 2012). "Trial courts enjoy broad discretion in ruling on a motion for a new trial," and "granting a new trial motion is warranted only in those limited

circumstances where 'a serious miscarriage of justice may have occurred.'" *United States v. Sheffield*, 76 F. Supp. 3d 148, 152 (D.D.C. 2014). This is one of those cases.

In this case, the three errors noted above that require a new trial have been extensively briefed before this Court, and Mr. Benton adopts and incorporates and renews those arguments herein. *See* ECF Nos. 35, 36, 48, 50. In the interests of judicial economy, Mr. Benton will not restate the arguments for each error, but will summarize the arguments herein in light of the trial evidence in this case.

    **1.**    **Admission of Mr. Benton's Prior Conviction Was Error and The Government's Arguments Regarding the Evidence Were Improper**

With respect to the motion in limine ruling permitting the admission of Mr. Benton's prior conviction, it is abundantly clear from the government's trial presentation that Mr. Benton's prior conviction was a critical component of its case. The prior conviction was stressed numerous times during both closing arguments, and based on the review of the transcripts of the arguments, the government exceeded the limitations set by the Court in its jury instructions.[1]

The jury instruction on the other crimes evidence stated that "[i]f you find that Mr. Benton committed the offenses as detailed in Government's Exhibit 30, you may also use this evidence for the limited purpose of deciding/determining whether the government has proved beyond a reasonable doubt that Mr. Benton acted knowingly and on purpose and willfully, and not by mistake or accident or in good faith." ECF No. 56, p. 21-22. The Court also cautioned the jury that "[y]ou may not use this evidence for any other purpose," and "you may not use this evidence to conclude that he has a bad character, or that Mr. Benton has a criminal personality.

---

[1] Counsel did not fully hear the precise wording by the government at the time of the closing, and also did not fully appreciate the cumulative effect of the statements that were made by the government during their closings, and before making an argument asserting that the arguments were potentially beyond the jury instruction, counsel sought to review the transcript, and is now raising this issue in this motion.

The law does not allow you to convict Mr. Benton simply because you believe he may have done bad things not specifically charged as crimes in this case." *Id*. at 22.

In the initial closing, government counsel referenced the limited purpose noted in the instruction, but also stated that "[a]nd one of the purposes as well, *modus operandi*." *See* Trial Transcript, Closing Argument, at Exhibit 4, p. 33-34. The rebuttal closing expanded on this and stated that:

> Well, you've heard evidence in this case that Mr. Benton is someone who likes to cover his tracks. And he makes plans in advance so if anybody later comes to ask him questions, he has a story to present. So he takes something that's not legal and tries to paper it over to make it look legit. Right?

*Id*. at p. 81.

> The government then re-emphasized this argument:
>
> You know he likes to cover his tracks. And you heard in the stipulation between the parties, Government's Exhibit 30, that Mr. Benton in 2016 was indicted of another case. And you heard in that stipulation that as part of that conspiracy that he was charged with, the manner and means, that the conspiracy would and did use two intermediary companies to conceal payments to a state senator; and the conspirators would and did conceal the payments to the state senator by a political committee by using false invoices.
>
> Now, ladies and gentlemen, the judge instructed you yesterday that you can consider his prior conviction for a limited purpose. One of them is for willfulness. That's what Ms. Wasserman discussed with you. And the other one is for MO. Does this track? Does it seem like the kind of thing that Mr. Benton is doing? Does this help you identify? His MO. ***This is how he commits his crimes***. You can consider it. If you see a pattern, you can consider it as indicative of his guilt. So when you think about why Mr. Benton consulted with his lawyer, it's against that backdrop. ***You know this is someone who likes to cover their tracks, who likes to create a story***.

*Id*. at 82 (emphasis added).

These references and statements went beyond the permissible uses of the prior conviction under Rule 404(b) as the instruction did not reference use of the evidence to establish *modus operandi* or a pattern, but rather the limited purpose of identifying whether Mr. Benton was the

8

person who committed the offenses, and deciding whether Mr. Benton acted knowingly and on purpose and willfully, and not by mistake or accident or in good faith.

Thus, the practical, cumulative impact of the government's expansion of the other crimes evidence jury instruction permitted the jury to use the conviction for the impermissible purpose of propensity or bad character evidence, to show Mr. Benton is a criminal who "likes to cover his tracks" and has a history of doing so. In fact, the "cover his tracks" reference was made three times in two pages of the closing, and that phrase indicates a historical pattern of criminal conduct – summarized by the government by stating "[t]his is how he commits his crimes." In *United States v. Richards*, the Court overturned a verdict when the prosecutor improperly used the other crimes evidence as propensity evidence. 719 F.3d 746, 764 (7th Cir. 2013). Specifically, the Court stated that:

> "[a]dmission of Rule 404(b) evidence, however, does not grant the government free rein to use that evidence however it wishes. Having obtained admission of the evidence for a specific, non-propensity purpose, the government cannot then deploy the Rule 404(b) evidence in support of some other argument or inference. Rather, it must limit its use of the evidence to the purpose proffered when admitting the evidence. . . It cannot ever rely upon that evidence to argue propensity."

*Id*.; *see also United States v. Rich*, 343 F.Supp.2d 411, 414 (E.D. Pa. 2004) (holding that the effectiveness of court's jury instructions in minimizing prejudice due to joinder of offenses was counteracted by prosecutor's improper comments during closing argument, and that "despite the instructions, the government's comments during closing argument invited the jury to do precisely what the law implores them not to do: to cumulate the evidence of the individual crimes charged and to infer a criminal disposition on the part of the defendant.").

All of this underscores how critical the prior conviction was to the government's case and how they emphasized it during the closing arguments. *United States v. McGill*, 815 F.3d 846, 878 (D.C. Cir. 2016) ("[c]onvictions are supposed to rest on evidence relevant to the crime

charged, not on evidence of other, unrelated bad acts suggesting nothing more than a tendency or propensity to engage in criminality."); *See United States v. Thorne*, 2020 WL 122985 at *5 (D.D.C. Jan 10, 2020) (CR 18-389) (stating that "[t]his rule (404b) codifies the common law tradition of "disallow[ing] resort by the prosecution to" propensity evidence — that is, "evidence of a defendant's evil character to establish a probability of his guilt.") (citations omitted); *see also United States v. Brown*, 765 F.3d 278, 205 (3rd Cir. 2014) (holding that Rule 404(b) error not harmless because "the stipulation suggested to the jury that Brown was a bad actor with a history of gun crimes. This necessarily impugns his character and tends to impermissibly sway the balance in the Government's favor," and citing Supreme Court precedent that explained that when propensity evidence is presented to a jury "it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge.") (citation omitted).

Therefore, both the admission of the other crimes evidence, and the impermissible expansion of the Court' jury instruction in closing argument compel a new trial.

> **2.   The Court's Ruling Permitting Cross-Examination on the Telegraph Article was Error**

With respect to the Court's ruling that the government could use the Telegraph evidence to cross-examine Mr. Benton, in addition to the ruling regarding the other crimes evidence, the Court's ruling effectively chilled Mr. Benton's right to testify in his own defense given the salacious nature of the highly prejudicial "click bait" Telegraph evidence that the government sought to use and the impact it would have clearly had on the jury. *See United States v. Maisonneuve*, 954 F.Supp. 114, 117 (D. Vermont 1997) (granting defendant's motion in limine under Rules 404(b) and 609 regarding a prior conviction because "[s]ince they involve the same type of conduct, the risk that a jury may assume guilt in the instant offense based upon past

convictions is enhanced. Further, *such a risk chills a defendant's Sixth Amendment right to testify in his or her defense*.") (emphasis added).

Use of a heavily edited, one-sided trap story set by enterprising journalists looking for exposure and internet clicks rendered Mr. Benton without an effective choice when it came to exercising his right to testify. It remains disconcerting that the government, and then the Court, gave credibility to a "gotcha" stunt by journalists looking for exposure. Therefore, this ruling permitting the Telegraph evidence to be used in cross-examination of Mr. Benton was in error as it effectively created an involuntary waiver of his right to testify. There is obviously no doubt that a criminal defendant has the constitutional right to testify in his defense, and it is "incumbent upon trial courts to prevent an involuntary waiver of the right." *See Rock v. Arkansas*, 483 U.S. 44, 51, 107 S.Ct. 2704 (1987); *Ortega v. O'Leary*, 843 F.2d 258, 263 (7th Cir. 1988). This ruling was in error, and Mr. Benton is entitled to a new trial where he is permitted to freely make his decision to testify without the unreliable, click-bait Telegraph evidence being raised as potential salacious cross-examination material.

### 3.     The Denial of Admitting Mr. Wead's Statements to the FBI Was Error

Finally, the Court's denial of co-defendant Doug Wead's statements to the FBI was extremely damaging to Mr. Benton's defense at trial. Specifically, the government spent most of its trial presentation presenting e-mails and statements made by Mr. Wead, including statements made before the alleged conspiracy began and during the alleged conspiracy. However, the jury was not able to see the proposed noticed statements that Mr. Benton proposed to admit which would have provided additional factual context, background, and critical information about the relationship between Mr. Vasilenko and Mr. Wead, and why Mr. Wead contacted Mr. Benton.

Mr. Benton carefully extracted 10 targeted statements from a 115 page transcript that were related to specific facts that were critical to Mr. Benton's defense, including the background of how Mr. Wead met Mr. Vasilenko and their ongoing relationship, the creation of the Charity Awards in Russia, the purpose of Mr. Vasilenko's September 2016 trip from Mr. Wead and Mr. Vasilenko's perspectives, and Mr. Benton's value and purpose according to Mr. Wead's and Mr. Vasilenko's purposes. *See* ECF No. 50.

With the Court's denial of the request to introduce those statements, the government was able to effectively have its evidentiary cake and eat it too – it was able to get Mr. Wead's e-mails and documents admitted into evidence, and ascribe only nefarious intent and meaning to them. The excerpts sought to provide context from a deceased co-defendant and a witness who was in a foreign country, and the excerpts were absolutely critical to the defense. As noted prior to trial, Mr. Benton asserted he would be hamstrung without the evidence, and that assertion came true as he was forced to defend against numerous Wead e-mails without context.

Although the government asserted that the statements were unreliable because it stated that individuals lie to law enforcement, that line of argument should have been made to the jury regarding the statements to allow them to weight the evidence rather than having them precluded from the evidence. As in *United States v. Slatten*, 865 F.3d 767, 806 (D.C. Cir. 2017), a case referenced by both parties during the briefing on this issue, there was no evidence "more probative on the point for" which Slatten sought to admit his co-defendant's statements, because they contradicted the required *mens rea*. Critically, *Slatten* held that "[a]llowing the jury to weigh the statements—to determine their weight, if any, as against the evidence incriminating Slatten—advances the Federal Rules of Evidence's goal of "ascertaining the truth and securing a just determination." *Id*. (citing Federal Rule of Evidence 102). Although the Court permitted the

12

jury to consider prior crimes evidence and allow the jury to weigh that evidence, the Court's ruling did not allow the jury to weigh the statements and determine any weight, effectively blocking Mr. Benton from a critical avenue of defense in this case, leaving him to defend against statements made by a deceased co-defendant and a foreign national who was not at trial. *See United States v. Weber*, 437 F.2d 327, 336 (3rd Cir. 1970) ("[w]hen the co-conspirator has died before trial, there is greater justification to lay aside the hearsay rule, because there is greater necessity. Unless exception is made to the general hearsay rule, there is a risk that the evidence contained in the extra-judicial statements of a deceased co-conspirator would be lost entirely.")

Without this evidence, the jury received half or even less of the complete picture in this case, all colored by the government's alleged nefarious purpose without the ability Mr. Benton to counter or challenge that narrative with the only evidence it has available.

### III.  Conclusion

Wherefore, it is respectfully requested that the Court grant Mr. Benton's motion for judgment of acquittal or in the alternative grant a new trial in this case.

Dated: December 1, 2022                            Respectfully submitted,


                                              By: */s/ Brian W. Stolarz*
                                                    Brian W. Stolarz (D.C. Bar No. 466160)
                                                    Norton Rose Fulbright US LLP
                                                    799 9th Street, NW, Suite 1000
                                                    Washington, DC 20001-4501
                                                    Telephone: (202) 662-0309
                                                    Facsimile: (202) 662-4643
                                                    Email: brian.stolarz@nortonrosefulbright.com
                                                    *Counsel for Defendant Jesse R. Benton*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this document filed through the CM/ECF system on December 1, 2022, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Brian W. Stolarz*
Brian W. Stolarz